Matter of DeVera v Elia (2018 NY Slip Op 07922)

Matter of DeVera v Elia

2018 NY Slip Op 07922 [32 NY3d 423]

November 20, 2018

Garcia, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, March 6, 2019

[*1]

In the Matter of Elaine DeVera, Individually and as Parent and Guardian of M.F., an Infant, et al., Petitioners, and Susana Taveras, Individually and as Parent and Guardian of K.R.R., an Infant, et al., Respondents,
v
MaryEllen Elia, as Commissioner of Education, et al., Appellants.

Argued October 10, 2018; decided November 20, 2018

Matter of DeVera v Elia, 152 AD3d 13, affirmed.

{**32 NY3d at 427} OPINION OF THE COURT

Garcia, J.

Charter schools are listed among the various eligible providers under the Statewide Universal Full-Day Prekindergarten Program. Unlike other providers, however, charter schools are separately governed by the New York Charter Schools Act, and all "monitoring, programmatic review and operational requirements" related to charter school prekindergarten programs are "the responsibility of the charter entity" and must be "consistent with the requirements" of the Charter Schools Act (Education Law § 3602-ee [12]). The issue before us is whether the statutory scheme governing charter school prekindergarten programs allows for shared oversight authority between charter entities and local school districts. We hold that it does not and, accordingly, affirm.
I.
Three statutory schemes are relevant to this appeal: two related to prekindergarten programs generally, and one related specifically to charter schools. We take each in turn.
[*2]In 1997, the legislature took its first pass at creating a "[u]niversal prekindergarten program" (Education Law § 3602-e [Legacy Pre-K Law]). The Legacy Pre-K Law essentially operated as a grant system, disbursing funds to school districts. The recipient school districts, in turn, were required to set aside "[n]ot less than ten percent of the total grant award . . . for collaborative efforts" with community organizations (Education Law § 3602-e [5] [e]). School districts were also authorized "to enter any contractual or other arrangements necessary to implement the district's prekindergarten plan" (Education Law § 3602-e [5] [d]).
{**32 NY3d at 428}The Legacy Pre-K Law was passed with the hope that prekindergarten would become universal throughout New York State by 2002 (New York State Comptroller, The 1997-98 Budget: Fiscal Review and Analysis [Sept. 1997]). But the program was plagued by funding difficulties (see Office of Senate Majority Coalition Leader Jeffrey D. Klein, An Economic Argument for NYC Mayor Bill de Blasio's Universal Pre-K Plan at 7 [Jan. 5, 2014] [describing erratic funding to state prekindergarten program under Legacy Pre-K]), and by school districts that "were slow to initiate or expand [prekindergarten] programs" (see Citizens Budget Commission, The Challenge of Making Universal Prekindergarten a Reality in New York State at 6 [Oct. 2013], cited in Office of Senate Majority Coalition Leader Jeffrey D. Klein, An Economic Argument for NYC Mayor Bill de Blasio's Universal Pre-K Plan). As a result, the goal of a universal prekindergarten program went largely unfulfilled.
Years later, in 2014, the legislature set out a new statutory framework governing prekindergarten programs (Education Law § 3602-ee [Universal Pre-K Law]). The Universal Pre-K Law came with an allocation of $340 million for prekindergarten funding in the State's 2014-2015 budget. Of that amount, $300 million was designated for New York City alone.
The Universal Pre-K Law created a new mechanism for the delivery of program services. Specifically, under the Universal Pre-K Law, school districts no longer bore sole responsibility for disbursing state funds to community organizations. Rather, the stated purpose of the Universal Pre-K Law was "to incentivize and fund state-of-the-art innovative pre-kindergarten programs and to encourage program creativity through competition" (Education Law § 3602-ee [1]). To that end, the new legislation expanded the pool of prekindergarten providers, and allowed "non-profit organizations, community-based organizations, charter schools, libraries and/or museums" to receive state money for prekindergarten programs (id. § 3602-ee [3] [a]). Under the new scheme, specified providers could receive state funds in one of two ways: they must first seek funding as part of their local school district's consolidated application—which must demonstrate a "diversity of providers" (id.)—to the State Education Department (SED); if (and only if) an eligible provider is rejected by the local school district for inclusion in a consolidated application, it may apply directly to the SED (see id. § 3602-ee [3]).
{**32 NY3d at 429}Under the Universal Pre-K Law, all prekindergarten providers "shall demonstrate quality on" eight factors, ranging from "curriculum" to "facility quality" (id. § 3602-ee [2]).[FN1] Providers are also subject to routine inspection. At least two of the provider's inspections each year must be performed by SED, "the school district with which [the provider] partners, if any, and [the provider's] respective licensing . . . entity" (id. § 3602-ee [10]). At least one inspection must be done by the licensing entity (id.). SED is also directed to "develop a statewide inspection protocol, which shall provide for annual inspections" (id. § 3602-ee [6]). The inspection framework designed by SED must include "a quality assurance protocol and physical plant review protocol" (id.).
Under the new statutory scheme, charter schools—not established in New York until after the Legacy Pre-K Law took effect—could qualify as providers of prekindergarten programs (id. § 3602-ee [3] [a]). Although listed among the eligible providers (alongside nonprofits and community organizations) in the Universal Pre-K Law, charter schools also have their own detailed statutory framework.
[*3]The Charter Schools Act, passed in 1998, "authoriz[ed] a system of charter schools to be created in New York State to provide opportunities for teachers, parents, and community members to establish and maintain schools that operate independently of existing schools and school districts" (Matter of New York Charter Schools Assn., Inc. v DiNapoli, 13 NY3d 120, 123 [2009] [internal quotation marks omitted]). To establish a charter school, an application must be submitted to, and approved by, a "charter entity" (Education Law § 2851 [3]). Qualification as a charter entity is limited to: (1) "[t]he board of education of a school district"; (2) "[t]he board of trustees of the state university of New York; or" (3) "[t]he board of regents" of SED (id.).
Charter schools must meet the "same health and safety, civil rights, and student assessment requirements applicable to other public schools," but they are otherwise "exempt from all other state and local laws, rules, regulations or policies governing{**32 NY3d at 430} public or private schools . . . [and] school districts," unless the Charter Schools Act specifies differently (Education Law § 2854 [1] [b]). The Charter Schools Act further provides that, "[n]otwithstanding any provision of law to the contrary, to the extent that any provision of [the Charter Schools Act] is inconsistent with any other state or local law . . . the provisions of [the Charter Schools Act] shall govern and be controlling" (Education Law § 2854 [1] [a]).
The Charter Schools Act is very specific with respect to governance and oversight. Each charter school is governed by a self-selecting board of trustees that has " 'final authority for policy and operational decisions of the school' " (DiNapoli, 13 NY3d at 125, quoting Education Law § 2853 [1] [f]). The school's enabling charter must "include the specific commitments of the charter entity relating to its obligations to oversee and supervise the charter school" (Education Law § 2852 [5]). The statute further specifies that "[o]versight by a charter entity and the board of regents shall be sufficient to ensure that the charter school is in compliance with all applicable laws, regulations and charter provisions" (Education Law § 2853 [2]).
The local school district also has a role, albeit a limited one, within the charter school framework. The district has the "right to visit, examine into, and inspect the charter school for the purpose of ensuring that the school is in compliance with all applicable laws, regulations and charter provisions" (Education Law § 2853 [2-a]). That said, any evidence of noncompliance is passed on to the Board of Regents and the appropriate charter entity for further action (id.). The Board and the charter entity retain ultimate oversight and compliance authority (see Education Law § 2855).
The Charter Schools Act provides that charter schools may serve grades 1 through 12 and are not prohibited from establishing a kindergarten program (Education Law § 2854 [2] [c]). The Universal Pre-K Law has an explicit provision specifying that charter schools are eligible to participate directly in prekindergarten programs, "provided that all such monitoring, programmatic review and operational requirements . . . shall be the responsibility of the charter entity and shall be consistent with the requirements under [the Charter{**32 NY3d at 431} Schools Act]" (Education Law § 3602-ee [12]).[FN2] As detailed above, the Charter Schools Act vests ultimate oversight of charter schools with a charter entity, gives the local school district only limited inspection authority, and exempts charter schools from all but a limited subset of "state and local laws, rules, regulations or policies governing public or private schools" (Education Law § 2854 [1] [b]).
II.
Against this statutory backdrop, we turn to the instant dispute. Petitioner Success Academy is a not-for-profit education corporation which operates dozens of charter schools across New York City.[FN3] In early 2015, Success Academy responded to a request for proposals (RFP) from the New York City Department of Education (DOE), its [*4]local school district, to receive funding for a total of 72 prekindergarten seats across three sites for the 2015-2016 school year.[FN4] The RFP was directed specifically to charter schools and required a detailed proposal concerning how the prekindergarten program would operate, including curricular submissions with examples of "rigorous learning experiences that provide opportunities for children to inquire, predict, problem solve, experiment, and draw conclusions." Under the terms of the RFP, all proposals that were "non-responsive to the requirements" would "be rejected." The RFP stated that funding would be contingent on execution of a contract with DOE, and a sample contract was attached.
In March 2015, DOE conditionally approved funding for Success Academy's three sites. Final acceptance was "contingent upon timely contract negotiations" which, DOE noted, "may include both the proposed cost per child amount and proposed start-up costs." In July 2015, three identical contracts (one for each site), titled "Full-Day Universal Pre-Kindergarten (UPK) Contract for Charters 2015-2018," were sent to Success Academy by DOE. Each contract was 241 pages (including appendices), and included provisions that sought to regulate the{**32 NY3d at 432} curriculum and operations of the charter school prekindergarten program. For example, the contracts contained detailed provisions controlling field trips (capping the number at no more than three per year); playtime (setting a "floor" at two hours and seven minutes); and screen time (capping the amount at 30 minutes per week). In addition, a provision in the proffered contract—entirely absent from the "sample" contract attached to the RFP—purported to give DOE "monitoring" authority, which would include "an assessment of curriculum planning and implementation" as well as broad discretion to change curriculum or operational requirements at any time.
Prekindergarten classes began at the three Success Academy sites in August 2015, with the participation of 72 students chosen by lottery from a pool of approximately 4,700. In October 2015, Success Academy formally objected to DOE's proposed contracts. Soon after, Success Academy sent invoices to DOE for payment, but DOE refused to pay without a contract.
Success Academy challenged DOE's actions in a proceeding before the Commissioner of SED. Two measures of relief were requested: an order directing DOE to pay for the prekindergarten programs already underway, and a declaration that the DOE contract was unlawful. On the first issue, the Commissioner found that DOE, "as a recipient of public grant funds from the State . . . has the responsibility to ensure proper disbursement and expenditure of the use of such public funds" and thus, "in the absence of an executed contract, DOE was not required to pay Success Academy" for the prekindergarten programs. On the second issue, the Commissioner determined that Education Law § 3602-ee (12)—which leaves "all monitoring, programmatic review and operational requirements" to "the charter entity"—did not constitute an exclusive grant of authority to the charter entity.[FN5] In the Commissioner's view, the best way to read subdivision (12) was to clarify that "the charter entity is also responsible for ensuring that the charter school complies with the requirements of the grant," and to further "clarify" that the charter entity is the "oversight agency" responsible for conducting one inspection pursuant to Education Law § 3602-ee (10). Although the Commissioner {**32 NY3d at 433}found two aspects of the DOE contract to be unlawful, the curricular and programmatic requirements in the contract were otherwise vindicated.[FN6]
Success Academy then filed this CPLR article 78 petition seeking to annul the Commissioner's determination. The petition sought similar relief: payment from DOE and a declaration that the proposed DOE contract was unlawful. Supreme Court dismissed the petition, holding that the Commissioner's decision was "rational and not arbitrary and capricious" (2016 NY Slip Op 31638[U], *22 [Sup Ct, Albany County 2016]). The court agreed that the Universal Pre-K Law "demonstrate[s] clear legislative intent towards joint inclusive oversight of charter school Pre-K providers" and that "DOE's contract requirement as a precondition for funding was lawful" (id. at *24, *26).
The Appellate Division unanimously reversed (Matter of DeVera v Elia, 152 AD3d 13 [3d Dept 2017]). According to that Court, the legislature's use of the word "all" in subdivision (12) provides the charter entity "with full responsibility for the relevant 'monitoring, programmatic review and operational requirements' for the relevant prekindergarten programs" and that the plain meaning of this provision "in no way indicates that another entity—such as a school district—holds concurrent responsibility or authority in this regard" (id. at 20, quoting Education Law § 3602-ee [12]). This reading, in the Appellate Division's view, "best harmonizes the provisions of the statute in a manner consistent with the Legislature's announced purpose" of the Universal Pre-K Law which was " 'to encourage program creativity through competition' " (id. at 21, quoting Education Law § 3602-ee [1]). The Court also determined that the plain meaning of the term "inspection" did not include a right to regulate the curriculum (id.; see Education Law § 3602-ee [10]). The Appellate Division remitted the matter to the Commissioner, given that "the Commissioner's determination regarding Success Academy's request for funding was affected by its erroneous interpretation of" the Universal Pre-K Law (id. at 22).
This Court granted leave to appeal.{**32 NY3d at 434}
III.
DOE and SED contend that deference to the Commissioner's interpretation is warranted and that the plain text of Education Law § 3602-ee (12) does not support the Appellate Division's reading thereof. They also argue that the Universal Pre-K Law, as a whole—along with certain sections of the Legacy Pre-K Law—supports a vigorous supervisory role for school districts over charter school prekindergarten programs. Lastly, they contend that the legislature's decision not to amend the Charter Schools Act provides additional support for their view of school district authority. None of these arguments are availing.
A.
We agree with the Appellate Division that deference is not warranted here. "Where . . . the question is one of pure statutory interpretation," we "need not accord any deference to the agency's determination and can undertake its function of statutory construction" (Matter of Albano v Board of Trustees of N.Y. City Fire Dept., Art. II Pension Fund, 98 NY2d 548, 553 [2002] [internal quotation marks omitted]). This concept applies equally in the realm of the Education Law (see Matter of Madison-Oneida Bd. of Coop. Educ. Servs. v Mills, 4 NY3d 51, 59 [2004] ["(I)n the instant case, this Court is faced with the interpretation of statutes and pure questions of law and no deference is accorded the (Commissioner's) determination"]). In this case, we are asked to analyze various statutory provisions in order to determine where and with whom the legislature housed oversight authority. As the issue is one of pure statutory interpretation, agency deference is unwarranted (see Lorillard Tobacco Co. v Roth, 99 NY2d 316, 322 [2003]).
B.
Our statutory analysis turns on subdivision (12) of the Universal Pre-K Law which provides that, for charter school prekindergarten programs, "all . . . monitoring, programmatic review and operational requirements . . . shall be the responsibility of the charter entity and shall be consistent with the requirements under article fifty-six of this chapter" (Education Law § 3602-ee [12]). DOE and SED argue that the plain language of this subdivision allows for joint authority over monitoring, programmatic review and operational requirements of charter school prekindergarten programs because the{**32 NY3d at 435} legislature did not delegate "sole" or "exclusive" responsibility to charter entities. We disagree.
"As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). Further, " '[t]he language of a statute is generally construed according to its natural and most obvious sense . . . in accordance with its ordinary and accepted meaning' " (Samiento v World Yacht Inc., 10 NY3d 70, 78 [2008]). Education Law § 3602-ee (12) is not ambiguous: it provides that "all such monitoring, programmatic review and operational requirements . . . shall be the responsibility of the charter entity" (emphasis added). As the Appellate Division noted, the use of "all" demonstrates that the legislature "tasked the charter entity with full responsibility for the relevant monitoring, programmatic review and operational requirements" (DeVera, 152 AD3d at 20 [internal quotation marks omitted]). In other words, the "use of 'shall' . . . makes what follows mandatory, and . . . 'all' means all" (Vadnais v Federal Natl. Mtge., 754 F3d 524, 526 [8th Cir 2014] [internal quotation marks omitted]).
Subdivision (12) of the Universal Pre-K Law also expressly incorporates the Charter Schools Act. By its terms, subdivision (12) mandates that the charter entity's responsibility for monitoring, programmatic review and operational requirements "shall be consistent" with the requirements of the Charter Schools Act (Education Law § 3602-ee [12]). The Charter Schools Act, in turn, largely consolidates monitoring and oversight in the charter entity (see Education Law §§ 2853 [1] [f]; [2]; 2852 [5]), and concomitantly circumscribes the role of the school district (see Education Law § 2853 [2-a]). In other words, the Charter Schools Act contemplates exclusive—rather than shared—responsibility for oversight, thereby foreclosing the "concurrent" authority scheme envisioned by DOE.
In sum, the terms of subdivision (12) "are plain" and, as such, "there is nothing left for interpretation" (Finger Lakes Racing Assn. v New York State Racing & Wagering Bd., 45 NY2d 471, 480 [1978]). The text of subdivision (12) vests exclusive oversight authority in the charter entity, and thereby acts to divest the school district of any existing authority to set{**32 NY3d at 436} curricular or programmatic requirements for approved, state-funded charter school prekindergarten programs.[FN7] C.
DOE and SED alternatively argue that ambiguity is created by other statutory provisions concerning prekindergarten programs. They point first to the inspection provision in the Universal Pre-K Law, subdivision (10), which allows for SED, charter entities, and local school districts (if the charter school is part of the school district's consolidated application) to inspect a charter school prekindergarten program (Education Law § 3602-ee [10]). In addition, SED and DOE invoke two provisions of the Legacy Pre-K Law: the first directs that "[a] school district receiving funding pursuant to this section shall agree to adopt approved quality indicators" (Education Law § 3602-e [17]), and the second provides that "[n]otwithstanding any other provision of law, the school districts shall be authorized to enter any contractual or other arrangements necessary to implement the district's prekindergarten plan" (id. § 3602-e [5] [d]). SED argues that these provisions "confirm[ ] the status of districts as the primary overseer of all pre-K programs operating under their consolidated grant awards."
"Whenever possible, statutory language should be harmonized, giving effect to each component and avoiding a construction that treats a word or phrase as superfluous" (Matter of Lemma v Nassau County Police Officer Indem. Bd., 31 NY3d 523, 528 [2018]). However, contrary to SED's claim, none of these provisions conflict with the system of oversight and governance created in the Charter Schools Act and expressly incorporated in subdivision (12) of the Universal Pre-K Law. The Charter Schools Act, for instance, enables school districts to "inspect" charter schools for compliance with "all applicable laws," but no one argues that this inspection provision somehow carries an implied oversight authority for school districts (see Education Law § 2853 [2-a]).
The inspection authority provided for in subdivision (10) is very different from that set forth in the monitoring provision of subdivision (12). "[W]ords employed in a statute are construed in connection with, and their meaning is ascertained by reference{**32 NY3d at 437} to the words and phrases with which they are associated" (McKinney's Cons Laws of NY, Book 1, Statutes § 239 [a]). Here, it is obvious that "monitoring" in subdivision (12)—placed alongside "programmatic review and operational requirements"—refers to ongoing, day-to-day oversight. Subdivision (10) states that a prekindergarten "provider shall be inspected . . . no fewer than two times per school year" (Education Law § 3602-ee [10]). Inspections under subdivision (10), in other words, are planned assessments given that a minimum number of them need to occur. As a result, there is a clear distinction between the day-to-day monitoring power contained in subdivision (12) and the scheduled observations contemplated by the inspection authority in subdivision (10) with respect to charter schools.
Nor do the Legacy Pre-K Law provisions help SED and DOE. The authority to adopt "quality indicators," or the general contracting authority found in the Legacy Pre-K Law, in no way gives authority to school districts to [*5]impose curricular and programmatic requirements on charter schools in light of the clear and plainly contradictory language of subdivision (12). Indeed, the Universal Pre-K Law—which expressly incorporates the oversight provisions of the Charter Schools Act—explicitly provides that its provisions supersede those of the Legacy Pre-K Law (Education Law § 3602-ee [7] [mandating compliance with Legacy Pre-K Law "except as otherwise provided in this section"]).
To be sure, a school district may reject a charter school (or any other provider) if the district does not approve the provider's proposed standards or curricular vision. And in this case, DOE said it would do exactly that: the RFP it put out for charter schools noted that proposals that did not conform to DOE's lengthy list of requirements would be rejected. Once a provider is rejected, however, the school district forgoes all responsibility for monitoring or oversight under subdivision (12), and the charter school provider is authorized to apply directly to SED.
Rather than rejecting proposals, DOE has consistently accepted charter school applicants but has conditioned those awards on the execution of a contract that contains unlawful terms, as applied to charter schools. Charter schools are thus placed in a no-win situation: accept those contractual terms, or decline them without recourse to apply directly to SED (see brief of amici curiae Achievement First Brooklyn Charter{**32 NY3d at 438} Schools et al. at 21-22 [noting two other charter school providers, in addition to Success Academy, are not offering state-funded prekindergarten because of DOE's contract]).[FN8] Nothing in the Universal Pre-K Law or Legacy Pre-K Law, however, gives school districts unilateral authority to impose curricular and programmatic requirements on charter schools—by contract or otherwise.
D.
DOE and SED lastly contend that the legislature's decision to add charter schools to the list of eligible providers in the Universal Pre-K Law, rather than amending the Charter Schools Act, suggests that charter schools were intended to be treated, in the context of prekindergarten, much like any other provider, thereby enabling SED and the school districts to exercise increased oversight. But as DOE and SED admit, the legislative history of the Universal Pre-K Law does not mention charter school oversight, much less override the existing regime set forth in the Charter Schools Act—indeed that regime is incorporated by reference. "[S]ilence in the legislative history" does not "lend any clarity" in this context (Encino Motorcars, LLC v Navarro, 584 US &mdash, &mdash, 138 S Ct 1134, 1143 [2018]), and we decline to infer such a substantial shift in the charter school oversight regime from such a subtle legislative choice.
If anything, the legislative design undercuts the position of both DOE and SED. The Universal Pre-K Law represented a dramatic expansion of legislative funding for prekindergarten; logically, then, it was placed within article 73: "Apportionment of Public Moneys." That being done, charter schools are singled out because of their unique status. The legislative command in subdivision (12)—that monitoring and oversight of charter schools offering prekindergarten "shall be consistent with the requirements under [the Charter Schools Act]"—clearly and unambiguously imports the existing oversight framework into the Universal Pre-K Law (Education Law § 3602-ee [12]).
{**32 NY3d at 439}Based on the foregoing, as the Appellate Division concluded, the Commissioner's determination was affected by an erroneous interpretation of Education Law § 3602-ee. Accordingly, the order of the Appellate Division should be affirmed, with costs.

Rivera, J. (dissenting). This appeal involves a dispute over the proper interpretation of laws that fund and set forth the programmatic and accountability requirements of New York State's prekindergarten (pre-k) programs. More is at stake here than the claimed payment for education services, as we are asked to determine who is responsible for ensuring the provision of high-quality pre-k programming for thousands of four year olds. Appellants are the Commissioner of the State Education Department (SED) and various New York City municipal entities who, together, are responsible for pre-k educational programs in the city. In this appeal, appellants argue that the City Department of Education (DOE), as the state-approved grantee for funding under the 2014 "Statewide Universal Full-Day Prekindergarten Program" legislation (Education Law § 3602-ee) (2014 Pre-K Law), has compliance responsibility for providers the DOE includes in its consolidated pre-k program, subordinate only to the ultimate oversight of the Commissioner. Appellants further maintain that the Commissioner properly determined that in the case of charter schools included in the consolidated program, the DOE and the charter entity have coextensive responsibility for the monitoring, programmatic review and operational requirements of the charter schools. The respondents on this appeal are Success Academy Charter Schools, a not-for-profit corporation that runs several charter schools in New York City, and certain parents of students enrolled in its pre-k programs. They claim that the three Success Academy charter schools accepted by the DOE for inclusion in its consolidated pre-k program were not subject to the DOE's compliance oversight.
The Commissioner interpreted the relevant statutes to conclude that the DOE acted within the scope of its designated role as grantee with responsibility for oversight of all the providers under its consolidated program when the DOE mandated compliance with its detailed contractual terms. That interpretation is supported by the statutory language and the State's universal pre-k framework. The majority's decontextualized focus on one provision of the 2014 Pre-K Law misreads the import of that section and reads into the language a carve-out for charter schools which undermines the accountability{**32 NY3d at 440} central to the State's pre-k system. The majority also ignores the promises made by Success Academy to be bound by state-approved DOE oversight. That is not what the legislature intended when it approved the 2014 Pre-K Law. I dissent.
I.
A. Statutory and Regulatory Framework
[*6]
In 1997 the legislature enacted the Universal Prekindergarten Program (Education Law § 3602-e) (1997 Pre-K Law).[FN1] The purpose of the legislation was to provide high-quality universal prekindergarten to all four-year-old children across the state (see Mem of St Education Dept, Bill Jacket, L 1997, ch 436 at 213; New York State Comptroller, The 1997-98 Budget: Fiscal Review and Analysis [Sept. 1997]; Natalie Gomez-Velez, Can Universal Pre-K Overcome Extreme Race and Income Segregation to Reach New York's Neediest Children? The Importance of Legal Infrastructure and the Limits of the Law, 63 Clev St L Rev 319, 330-331 [2015]).
The law was a response to a growing body of research on the foundational importance of early childhood education and the lack of access to prekindergarten programs for low-income families (Gomez-Velez at 331). The number of studies and academic papers supporting this view continued to grow in the years after the passage of the 1997 Pre-K Law. Neuroscience studies have since established that pre-k programs are beneficial to the long-term development and educational success of children (id. at 330; James E. Ryan, A Constitutional Right to{**32 NY3d at 441} Preschool?, 94 Calif L Rev 49, 57 [2006] ["(R)esearchers agree that preschool programs can have long-term, positive effects on academic achievement"]; W. Steven Barnett, Preschool Education and Its Lasting Effects: Research and Policy Implications, University of Colorado at Boulder, Education and Public Interest Center and Arizona State University Education Policy Research Unit at 16 [2008], https://nepc.colorado.edu/sites/default/files/PB-Barnett-EARLY-ED_FINAL.pdf).
In addition, social science research has revealed the relative benefits of pre-k programs for children from low-income families. Studies have shown that "there is typically a wide gap in school readiness between poor and more affluent children when they enter kindergarten" and that pre-k programs have worked to narrow that gap (Ryan, at 56-57; Hirokazu Yoshikawa et al., Investing in Our Future: The Evidence Base on Pre-School Education, Foundation for Child Development and Society for Research in Child Development at 11 and n 47 [2013]). Thus, the interest in pre-k programs was driven in part by the understanding that such programs could be a vehicle to improve opportunities for children from low-income families, which provided a basis for many targeted means-based early education programs (Gomez-Velez at 327-328; Halley Potter, Lessons from New York City's Universal Pre-K Expansion: How a Focus on [*7]Diversity Could Make it Even Better, The Century Foundation at 3 and n 9 [May 13, 2015] [noting that four most studied preschool programs primarily served low-income families]).
However, political support for universal, rather than means-tested, pre-k gathered as research demonstrated the educational, fiscal, and policy benefits of free and accessible pre-k education for all children (see Gomez-Velez at 330-331; Hirokazu Yoshikawa et al. at 2 [noting that early research focused only on programs for low-income children, but that more recent research on universal preschool programs have indicated that while low-income children benefit most from such programs, middle-class children benefit substantially as well]; Pew Charitable Trusts, Pew Center on States, The Costs of Disinvestment: Why States Can't Afford to Cut Smart Early Childhood Programs [Jan. 19, 2010] [noting that "(d)epriving children of a strong developmental start increases costs for parents, hospitals, schools and communities" and that "(e)arly childhood programs stimulate the local economy"]; Arthur Macewan, Early Childhood Education, Economic Development, {**32 NY3d at 442}and the Need for Universal Programs: With a Focus on New England, 10 Economic, Mgt, and Fin Mkts 1, 26-31 [2015] [noting that state investment in universal pre-k provides an immediate economic impact as more parents are able to enter the labor force, parents in the workforce are more productive, and childcare jobs are created]). Notably, research indicated that universal pre-k programs may provide an additional educational and policy benefit in integrating children in racially and socioeconomically diverse classrooms (Jeanne L. Reid, Socioeconomic Diversity and Early Learning: The Missing Link in Policy for High-Quality Preschools, in The Future of School Integration: Socioeconomic Diversity as an Education Reform Strategy 75-79 [Richard D. Kahlenberg ed, The Century Foundation 2012] [noting the educational benefits of racially and socioeconomically diverse peer interaction, and that these interactions may "destabilize emergent prejudices" as at least one study "found that in racially diverse kindergartens, children's acceptance of peers and friendships transcend(ed) racial and ethnic identities"]; Potter at 5 ["recent research suggests that the socioeconomic and racial diversity of preschool classrooms is a key component of their educational quality"]).
Against this backdrop, and in response to the need for adequate funding to expand the availability of full-day pre-k programs and make them truly universal, the legislature enacted the Statewide Universal Full-Day Prekindergarten Program in 2014 (2014 Pre-K Law). The newly enacted law expanded the program established under the 1997 Pre-K Law and shares many of its statutory components. Under the 2014 Pre-K Law, the State Commissioner of Education continues to administer the state's pre-k program through a similar competitive process by which a school district submits a consolidated application—meaning an application that includes a diverse group of providers (Education Law § 3602-ee [3], [4]).[FN2] A non-school district provider may apply individually only if the{**32 NY3d at 443} school district denies its inclusion in the consolidated application (Education Law § 3602-ee [3] [b]).[FN3]
[*8]Both statutes were intended to improve collaboration and partnership between school districts and local providers and encourage innovation in programming and delivery of services (compare Education Law § 3602-e [5] [allowing school districts, other than that of New York City, to coordinate pre-k services with early childhood programs, community-based organizations, and nursery schools, and indicating that districts should select partners based on a competitive application process], with Education Law § 3602-ee [3] [a] [awarding grants to school districts that include pre-k programs operated by "schools, non-profit organizations, community-based organizations, charter schools, libraries and/or museums"], and [4] ["Programs that provide more stimulation, enhance child development and demonstrate creative approaches to improve early childhood education will have a competitive advantage in the application process"]).
To ensure high quality programming, the 2014 Pre-K Law requires compliance with all rules and requirements of the 1997 Pre-K Law, unless otherwise provided, and imposes programmatic and operational requirements, including that grantees demonstrate quality of programs in eight "elements": "(a) curriculum; (b) learning environment, materials and supplies; (c) family engagement; (d) staffing patterns; (e) teacher education and experience; (f) facility quality; (g) physical well-being, health and nutrition; and (h) partnerships with non-profit, community and educational institutions" (Education Law § 3602-ee [2]). The 2014 Pre-K Law continues the school districts' central role in ensuring compliance with the statutory standards. Specifically, because the law withholds funds from non-compliant programs and school districts are responsible for selecting providers into its consolidated application which must be approved by the Commissioner, school districts are made accountable for ensuring the compliance of their participating programs (see Education Law § 3602-ee [7], [8] [c]). As the Commissioner explains, while she remains ultimately responsible for enforcing legal and regulatory requirements{**32 NY3d at 444} over all pre-k providers, the school districts are responsible at the local level for the supervision and oversight of the providers included in the school districts' consolidated application (Education Law §§ 3602-ee [3] [d]; [7]; 3602-e [13]).[FN4]
B. New York City's Universal Pre-K Program
Prior to the 2014 Universal Pre-K Law, New York City provided free pre-k education under the 1997 Pre-K Law. Under that statutory framework, families in New York City had access to pre-k programming through federally funded Head Start[FN5] programs that offered full-day pre-k education, as well as through programs funded by Administration for Children Services (ACS) or ACS vouchers (Office of the Mayor, Office of Management and [*9]Budget, Department of Education and Administration for Children's Services, Ready to Launch: New York City's Implementation Plan for Free, High-Quality, Full-Day Universal Pre-Kindergarten at 2 [Jan. 2014]; Potter at 6).[FN6]
However, these services did not meet the need. In fact, the 1997 Pre-K Law failed to reach its goals, as only one in four four-year-olds was enrolled in pre-k by 2002—the law's target year for providing universal pre-k (W. Steven Barnett et al., The State of Preschool 2003: State Preschool Yearbook, National Institute for Early Education at 104 [2003]). Even as New York City expanded its program by increasing the number of seats{**32 NY3d at 445} in low-income, high-needs neighborhoods, Mayor Bill de Blasio estimated that, by 2014 "73,250 families [would] need a full-day pre-K option for their 4-year-old" and that fewer than 27% of these children have access to full-day pre-k programs (Ready to Launch at 4). The 1997 Pre-K Law was hindered by unstable funding: while the law was scheduled to provide $500 million for every year after 2000, the State never reached that level as schools were both slow to implement programs and fiscal constraints forced reductions in allocations of funds (Gomez-Velez at 337-340).
In 2013, Mayor de Blasio campaigned to further expand universal pre-k in New York City by creating more full-day seats and converting half-day seats to full-day (Potter at 6). In January 2014, the DOE released its plan for providing universal pre-k services under the recently enacted 2014 Pre-K Law. The goal was "to implement a truly universal pre-kindergarten system in New York City that provides every 4-year-old with high-quality, full-day pre-K" (id.). The proposal was the result of collaboration by numerous city agencies that studied successful universal pre-k programs outside of New York (id. at 8). The combined effort developed its vision for the DOE's universal pre-k program: implement "standards-based instruction oriented around the state pre-K learning standards, [New York State] Pre-kindergarten Foundation for the Common Core"; provide six hours and 20 minutes of free instruction for 180 days; provide sufficient levels of compensation to attract effective teachers; provide increased support for English language learners; increase support for families by providing more social workers and more intensive support in schools; and increase the number of on-site coaches to provide more targeted support for pre-k programs and better "assess how children, teachers and programs are performing each year" (Ready to Launch at 9-10).
Given the shortcomings of the 1997 Pre-K Law, the DOE recognized the central importance of adequate funding. "Without a high level of multi-year, guaranteed funding," the DOE's proposal stated, "agencies and providers will be unable to secure the quality educators and space necessary to serve every child in New York City" (Ready to Launch at 2). As political momentum grew, the legislature allocated $300 million for the DOE region's 2014 Pre-K Law award (see Education Law § 3602-ee [5]; Potter at 7). This amounts to roughly 78% of the funding for the DOE's pre-k program, with 21% provided by a{**32 NY3d at 446} city tax levy, and 1% through federal grants (Caitlin McLean et al., Strategies in Pursuit of Pre-K Teacher Compensation Parity: Lessons from Seven States and Cities, Center for the Study of Child Care Employment, University of California, Berkeley and National Institute for Early Education Research at 38 [2017]).[FN7] [*10]C. DOE Grant
The process by which the DOE sought and obtained a grant for its consolidated application for the 2015-2016 school term is not in dispute. Pursuant to the newly-enacted 2014 Pre-K Law, the SED issued a request for proposals (RFP) in which it made clear that: (1) grantees must comply with the statutory and regulatory standards; (2) grants awarded through this competition would be renewed in subsequent years "provided that the program meets quality standards and all applicable requirements"; (3) "the school district applicant is required to assure that it and each eligible entity participating in its consolidated application will adopt and implement approved quality standards in accordance with this RFP"; (4) "[s]chool districts are also responsible for supervision of prekindergarten classrooms in all entities included in its consolidated application"; (5) charter schools included in a school district's consolidated application "cannot apply separately for supplemental funds" because those funds are provided to the applicant, which is the school district not the charter school; and (6) charter schools cannot comingle pre-k funds with its other funds.
In sum, the RFP initiated the competitive bidding process for initial awards of funds for pre-k seats. Those awards were disbursed based on a grantee's application, which, in the case of a consolidated application, included the school district's promise to comply with the State's required statement of assurances set forth in the SED's RFP. The awards would be renewed the following year so long as the applicant's programming, as described in its submission, complied with quality standards and all applicable requirements. In other words, the initial award was renewable unless the grantee—and its providers—failed to comply with its assurances of delivering {**32 NY3d at 447}high-quality pre-k programming as described in the initial grant proposal.
In line with the statutory allocation, the DOE submitted a proposal for a $300 million award to fund a multi-year pre-k program that would "provide over 50,000 high-quality full-day seats in the 2014-2015 school year, and an additional 20,000 seats in the 2015-2016 school year" for just over 70,000 seats, which included 200 seats in charter school settings. The funding would establish "NYC's Pre-K for All," which the DOE described as a "single-system of high-quality pre-k in [New York City] managed by the [City's] DOE." The Pre-K for All program adopted a quality assurance cycle framework "of monitoring, interventions, and support based on comprehensive quality standards covering: curriculum, instruction, the classroom learning environment, family engagement, staff credentialing, professional development, facility health and safety, and operational practices needed to offer high-quality full-day pre-k services that prepare children for kindergarten and set them on a path towards college and career readiness." Moreover, the DOE represented that "[t]he classroom environment is assessed in all settings with the [Early Childhood Environment Rating Scale] tool," a nationally recognized scale for assessing early childhood education programs.[FN8] The DOE further assured that it would adopt approved quality standards and ensure the providers implemented them in accordance with this RFP.
The SED approved the DOE's consolidated application and, in a follow-up letter, reminded the DOE that school districts were "responsible for monitoring program quality for all community program providers . . . which utilize [2014 Pre-K Law] grant funds sub-allocated by the district to provide prekindergarten services" for the 2015-2016 school year. The SED further directed the DOE to use the SED's Quality Assurance Protocol Observation Document—a document developed pursuant to the 2014 Pre-K Law (Education Law § 3602-ee [6] [requiring the SED to develop a statewide inspection protocol, "which shall provide for annual inspections of all universal{**32 NY3d at 448} full-day pre-kindergarten providers, and shall develop a quality assurance protocol and physical plant review protocol for such [*11]reviews"]). The SED also instructed the DOE to focus primarily on the assurance protocol sections addressing curriculum learning environment, family engagement, physical well-being and health, and screenings and assessments. The SED encouraged the DOE "to begin this work now" because SED staff visiting the district would "expect to see evidence that the district is working closely with its community partners to ensure quality and accountability, even if the quality monitoring visit has not yet occurred."
Thereafter, the DOE issued an RFP to solicit providers for its consolidated pre-k program and a separate RFP targeting charter schools. As relevant here, both RFPs stated that "[a]wards will be made to charter schools that demonstrate the ability to meet programmatic quality and operational expectations, objectives and regulations set forth by the New York State Education Department and the New York City DOE." Both also stated that the awards were subject to completion of contract negotiations with the DOE and registration for the contract with the City Comptroller. The charter school RFP contained a sample contract which set forth programmatic baseline requirements[FN9] as well as evaluation and assessment mandates. For example, the contract conditioned funding on a program's implementation of an authentic assessment system, production of its data to the DOE, and participation in the DOE's quality assurance protocol, which involved on-site reviews by the DOE and, where necessary, action plans to resolve programmatic concerns.
D. The Charter Schools' Challenge to DOE Oversight
Three Success Academy charter schools applied and were approved for inclusion in the DOE's consolidated program for the{**32 NY3d at 449} 2015-2016 school year, subject to completion and registration of the DOE contract, as providers of 72 pre-k seats.[FN10] Success Academy failed to sign the contracts but commenced the pre-k programs, despite the DOE's warnings that it could not guarantee payment without a signed contract registered with the State Comptroller, and that Success Academy was operating "at [its] own risk."
When the DOE denied reimbursement for the programs, Success Academy appealed to the Commissioner, essentially disputing any programmatic or fiscal oversight by the DOE. Success Academy challenged, in part and as relevant to this appeal, the DOE's contracts as arbitrary and unauthorized because under subdivision (12) of the 2014 Pre-K Law (Education Law § 3602-ee [12]) a charter school's "charter entity" has sole responsibility for charter school pre-k monitoring, programmatic review and operational requirements. The Commissioner rejected the challenge, sustained the DOE contract requirement and all but two of the terms set forth therein, and concluded that section 3602-ee (12) did not grant charter entities the exclusive or sole responsibility for the monitoring, [*12]programmatic review, and operational requirements of participating charter schools, and instead provides for the coextensive compliance responsibility of the charter entity and the school district grantee.
The Commissioner reasoned that Success Academy's interpretation of the 2014 Pre-K Law conflicted with various provisions of the law that expressly granted oversight authority to school districts. Specifically, subdivision (10) (Education Law § 3602-ee [10]) required that pre-k programs be inspected by the SED, school district, and charter entity, while subdivision (6) (Education Law § 3602-ee [6]) required the SED to develop the inspection protocol. In addition, article 56 of the Education Law, the Charter Schools Act (CSA) (Education Law § 2850 et seq.), which governs the operation of charter schools in the state, also authorized school districts to "visit, examine into and inspect" charter schools for the "purpose of ensuring that the school[s] [are] in compliance with all applicable laws" (Education Law § 2853 [2], [2-a]). In light of these provisions, and the fact that subdivision (12) does provide "exclusive" or "sole" oversight authority to charter entities, the Commissioner held:{**32 NY3d at 450}
"[t]o harmonize these seemingly conflicting statutory provisions (McKinney's Statutes § 98), I interpret the language of Education Law § 3602-ee(12) as having two effects. First, it clarifies that in the case of a charter school, the charter entity is also responsible for ensuring that the charter school complies with the requirements of the grant, and can invoke the enforcement mechanisms under Article 56. Second, it further clarifies that the charter entity is the 'oversight agency' responsible for conducting at least one inspection under Education Law § 3602-ee(10) in order to monitor, engage in programmatic review and enforce the operational requirements of the program."
The Commissioner further noted that Success Academy's argument that the DOE lacked authority to impose such requirements was meritless because:
"[h]ad the Legislature intended that charter schools be exempt from the [2014 Pre-K Law] program requirements, it could have amended Article 56 to authorize charter schools to serve pre-kindergarten students and fund such programs under Article 56 and/or created a separate pre-kindergarten funding program for charter schools, but it did not do so. Instead, the Legislature in Education Law § 3602-ee(12) chose only to allow charter schools to participate in the [2014 Pre-K Law] program."
Success Academy and parents of students attending its charter schools' pre-k programs commenced this CPLR article 78 proceeding challenging the Commissioner's determination. Supreme Court sustained the decision and dismissed the petition (2016 NY Slip Op 31638[U] [Sup Ct, Albany County 2016]). The Appellate Division reversed and annulled the determination to the extent that it upheld certain of the DOE's contract terms on the ground that the use of the term "all" in section 3602-ee (12) means that charter entities have exclusive responsibility for participating charter schools' pre-k programs (152 AD3d 13 [3d Dept 2017]). We granted leave to appeal and the majority now affirms, adopting the same interpretation as that of the Appellate Division and Success. In so doing, the majority permits Success Academy to avoid its representations to the DOE to abide by the DOE's RFP terms and also adopts a decontextualized interpretation of section 3602-ee (12). That{**32 NY3d at 451} section's provision for charter entity oversight of charter school programs must be understood within the larger pre-k statutory framework.
II.
At the time that Success Academy applied to join the DOE's consolidated application, it was aware that inclusion in the application was contingent on a promise to meet all programmatic and operation requirements of the 2014 Pre-K Law and completion of a contract agreeing to abide by baseline requirements designed by the DOE to ensure the proper delivery of programs in conformance with statutory and regulatory mandates. These baseline requirements had been approved by the SED—the entity responsible for awarding grant funds, developing inspection protocols and quality standards, and ensuring pre-k providers meet the requirements of the statute. Success Academy represented to the DOE that it would abide by the DOE's RFP terms and these baseline requirements. The DOE relied on that promise when it conditionally approved the Success Academy charter schools for inclusion in its consolidated program. Success Academy cannot now argue that it should not be bound by its promise.
[*13]
The entire pre-k law framework is based on the representations of a grant applicant that it will comply with the statutory requirements and the inspection and quality assurance protocols developed by the State pursuant to section 3602-ee (6). For a school district, the consolidated application must represent that it will ensure compliance of its providers by programmatic and administrative oversight. Indeed, section 3602-ee (10) mandates that both the State and the school district shall inspect a pre-k provider.
Notably, the 2014 Pre-K Law provides for charter schools to apply individually if they are rejected by the school district for inclusion in the consolidated application. Success Academy could have sought inclusion, clarifying that under its interpretation of the statute it did not have to abide by the DOE's requirements.[FN11] Presumably, the DOE would have denied inclusion of the charter schools in its application. If not, Success Academy could have requested that the DOE officially deny{**32 NY3d at 452} the charter network's pending applications. Success Academy, or the individual schools, could then have submitted an application to the SED that would have been considered alongside consolidated applications. Instead, what Success Academy did was ignore DOE's reminders that inclusion was conditioned upon the contract and proceeded to operate its pre-k program as if it was included in the DOE's consolidated application, narrowing its competitors to other charter school providers vying for inclusion in the consolidated application, rather than having to compete with the DOE overall. This undermines the legislative framework and purpose to encourage competition. This is particularly striking given that the 2014 Pre-K Law states that "[p]rograms that provide more stimulation, enhance child development and demonstrate creative approaches to improve early childhood education have a competitive advantage in the application process" (Education Law § 3602-ee [4]). If, as Success Academy and its supporting amici argue, charter schools are particularly known for improving their students' educational standing based on innovation, grounded on independence from governmental bureaucracy, then Success Academy would have been well placed to submit an independent application.[FN12] III.
Assuming Success preserved its challenge to the DOE's contract terms, the claim is without merit. As the Commissioner correctly determined, the DOE is responsible for programmatic and administrative oversight of its consolidated program pre-k providers, including charter schools. The 2014 Pre-K Law did no more than authorize coextensive monitoring with the charter entity. "When presented with a question of statutory interpretation, a court's primary consideration 'is to ascertain and give effect to the intention of the Legislature' " (Matter of Lemma v Nassau County Police Officer Indem. Bd., 31 NY3d 523, 528 [2018], quoting Riley v County of Broome, 95 NY2d 455, 463 [2000]). "The clearest indicator of legislative intent is the statutory text and unambiguous language should be construed pursuant to its plain meaning" (id.). However, this Court is "also guided in [its] analysis by the familiar principle 'that a statute . . . must be construed as a whole and {**32 NY3d at 453}that its various sections must be considered together and with reference to each other' " (Matter of New York County Lawyers' Assn. v Bloomberg, 19 NY3d 712, 721 [2012], quoting People v Mobil Oil Corp., 48 NY2d 192, 199 [1979]). Harmonization of statutory provisions is not limited to language in the statute to be construed; incorporation of other statutory provisions and mandates sheds additional light on legislative intent, especially where the incorporated language is from a statute on the same subject matter (see Matter of M.B., 6 NY3d 437, 447 [2006] ["When the terms of related statutes are involved, as is the case here, they must be analyzed in context and in a manner that 'harmonize(s) the related provisions . . . (and) renders them compatible' "], quoting Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington, 97 NY2d 86, 91 [2001]). Moreover, where legislation establishes a framework for both procedural and substantive protocols, [*14]selective or partial incorporation of another statute's language may reflect interpretive choices similarly relevant to ascertaining the conceptual parameters of that framework (id.).
Thus is the case here, where the 2014 Pre-K Law establishes a framework that incorporates and builds on the 1997 Pre-K Law by funding additional seats in an effort to achieve statewide universal full-day pre-k, adopting a preference for school district consolidated applications that encourages collaboration and enables greater accountability through school district oversight of the district's designated providers, and imposing enhanced quality standards on all programs.
To achieve these benchmarks, the 2014 Pre-K Law states that "[t]he [SED] shall develop a statewide inspection protocol, which shall provide for annual inspections of all universal full-day pre-kindergarten providers, and shall develop a quality assurance protocol and physical plant review protocol for such reviews" (Education Law § 3602-ee [6]). Further, "[s]tatewide universal full-day pre-kindergarten slots shall only be awarded to support programs that provide instruction for at least five hours per school day for the full school year and that otherwise comply with the rules and requirements pursuant to section thirty-six hundred two-e of this part except as otherwise provided in this section" (Education Law § 3602-ee [7]). The school districts must ensure that its providers comply with the SED's protocol (8 NYCRR 151-1.3). The school district's central accountability role is further established by its duty to inspect. As the 2014 Pre-K Law provides:{**32 NY3d at 454}
"[n]otwithstanding any provision of law to the contrary, a universal full-day pre-kindergarten provider shall be inspected by the [SED], the school district with which it partners, if any, and its respective licensing, permitting, regulatory, oversight, registration or enrolling agency or entity no fewer than two times per school year, at least one inspection of which shall be performed by the eligible agency's respective licensing, permitting, regulatory, oversight, registration or enrolling agency, as applicable" (Education Law § 3602-ee [10]).[FN13]
Success Academy's argument adopts the Appellate Division's analysis which interprets another provision of the 2014 Pre-K Law that states, in full:
"Notwithstanding paragraph (a) of subdivision one of section twenty-eight hundred fifty-four of this chapter and paragraph (c) of subdivision two of section twenty-eight hundred fifty-four of this chapter, charter schools shall be eligible to participate in universal full-day pre-kindergarten programs under this section, provided that all such monitoring, programmatic review and operational requirements under this section shall be the responsibility of the charter entity and shall be consistent with the requirements under article fifty-six of this chapter. The provisions of paragraph (b) of subdivision two of section twenty-eight hundred fifty-four of this chapter shall apply to the admission of pre-kindergarten students, except parents of pre-kindergarten children may submit applications for the two thousand fourteen—two thousand fifteen school year by a date to be determined by the charter school upon selection to participate in the universal full-day pre-kindergarten program. The limitations on the employment of uncertified teachers under paragraph (a-1) of subdivision three of section twenty-eight hundred fifty-four of this chapter shall apply to all teachers from pre-kindergarten through grade twelve" (Education Law § 3602-ee [12]).
Since the 2014 Pre-K Law assigns to a school district authority to inspect and supervise the providers included in a{**32 NY3d at 455} consolidated application, the question is not whether the law intends for the school district to play a central oversight role to ensure programmatic and administrative compliance with the statutory standards and the district's performance standards. Rather, the narrow question before us is whether the language of section 3602-ee (12) allows for only one possible construction: an exception from this general school district authority and the grant of exclusive [*15]oversight of charter schools by their charter entities. That interpretation is not supported by the statute when viewed in the context of the 2014 Pre-K Law's framework, the incorporated 1997 Pre-K Law, and the CSA.
Charter schools are a creature of the CSA, which "authorize[s] a system of charter schools to provide opportunities for teachers, parents, and community members to establish and maintain schools that operate independently of existing schools and school districts" for purposes, inter alia, of improving and increasing learning opportunities and adopting a performance-based accountability rather than rule-based system (Education Law § 2850 [2] [a], [b], [f]). Charter schools are governed by their charter entities and strictly limited to providing K-12 educational programming (Education Law §§ 2853 [2], [2-a]; 2854 [2] [c]).[FN14]
However, a charter school is eligible to participate as a universal pre-k program provider under the 2014 Pre-K Law as authorized by section 3602-ee (12), but that authorization does not amount to the charter school's complete exclusion from the school district's oversight in its role as the grantee for the consolidated application. Nor can the language in section 3602-ee (12) that imposes responsibility for the monitoring, programmatic review, and operational requirements be read as prohibiting any supervisory oversight of charter schools by the school districts who award them funds. Instead, section 3602-ee (12) permits the charter entity to exercise an oversight role that is otherwise prohibited by the 2014 Pre-K Law since only the SED and the school district have responsibility for compliance. The use of the word "all" here is meant to express the legislative intent that the charter entity has comprehensive{**32 NY3d at 456} responsibility over monitoring, not that it has exclusive oversight power. If, as petitioners argue, the legislature intended to place charter schools outside the programmatic and administrative oversight of the pre-k framework, imposing sole responsibility for compliance with charter entities, the legislature would have used terms that clearly expressed this carve-out for charter schools. In other words, rather than use a term that references quantity—i.e. "all" (Merriam-Webster Online Dictionary, all, https://www.merriam-webster.com/dictionary/all [defining "all" as "the whole amount, quantity, or extent of"])—the legislature would have said that "monitoring, programmatic review and operational requirements" are the "exclusive province of the charter entity," or that the charter entity was "solely responsible" for this type of oversight.
The fact that the legislature added that the exercise of this responsibility "shall be consistent with the requirements under [the CSA]" confirms that the intent was for charter entities to bear responsibility for the charter schools' pre-k program compliance in a manner that does not conflict with the schools' charters or the CSA. Better still, if the legislature intended for charter schools to provide pre-k programs without school district supervision it would simply have amended the CSA, and in that way made clear what petitioners state is the true intention of subdivision (12) to permit charter schools to run fully independently of the school district. The legislature did not follow this direct course and the petitioners' circuitous route to this conclusion is not supported by the State's pre-k framework.
Moreover, nothing in the legislative history supports an intention to exclude charter schools from school district oversight.[FN15] Understandably so, because this level of independence would undermine the 2014 Pre-K Law's [*16]centralized quality control apparatus by which consolidated applications are preferred and district programming prioritized for funding, as well as the obligation of school districts to evaluate and inspect{**32 NY3d at 457} its providers for compliance with the quality elements set forth in section 3602-ee (2) and the SED's quality assurance and inspection protocols designed in satisfaction of the mandates of section 3602-ee (6).
To explain its conclusion why Success Academy's charter schools are not subject to the DOE's oversight in accordance with the State's pre-k framework and the DOE state-approved contractual terms, the majority minimizes the DOE's authority to inspect under section 3602-ee (10). According to the majority, because that section refers to a minimum number of mandatory inspections, it should be understood to authorize what the majority calls "planned assessments" which, as this argument goes, are distinct from the type of oversight authorized by section 3602-ee (12), which the majority concludes "refers to ongoing, day-to-day oversight" by a charter entity of a charter school (majority op at 
437). Apart from the fact that the majority's descriptors are nowhere found in the statutory language, much less the meaning the majority attaches to them, the analysis advocated here fails to persuade. First, the legislature's choice to require a minimum number of inspections says nothing about the scope of the inspector's authority. Second, the fact that section 3602-ee (10) sets a minimum, not a maximum, on inspections demonstrates the legislature's grant of expansive, not narrow, oversight power as the need for additional inspections to ensure compliance with the law is left solely to the discretion of the inspecting authority.
The fundamental problem with the majority's construction is that it does not read the statutory provisions in context and ignores that section 3602-ee (10) and (12) are part of a larger framework of provider oversight by the SED and approved school districts. The majority's failure to recognize this broader framework also leads it to misconstrue the SED and DOE arguments; they do not seek to impose requirements on charter schools that contradict section 3602-ee (12) (majority op at 
437), but rather to exercise their coextensive authority within that framework. If this were not enough, the majority's interpretation of section 3602-ee (12) falls under the weight of its own conclusion because it leads to the absurd result of stripping charter school oversight from the SED—the sole entity legislatively charged with approving grants for pre-k programs in accordance with its own scoring system and developing statewide inspection and quality assurance protocols mandated{**32 NY3d at 458} for provider annual inspections (Education Law § 3602-ee [2], [5], [6], [7]).[FN16]
Similarly unpersuasive is the argument of Success Academy and its supporting amici that a carve-out for charter schools furthers the statutory purpose to "incentivize and fund state-of-the-art innovative pre-kindergarten programs and encourage program creativity through competition" (Education Law § 3602-ee [1]), as charter schools are crucibles for innovation, and their educational model has resulted in increased academic proficiency—beyond that [*17]observed in traditional public schools—that has narrowed the achievement gap for low-income children.[FN17] Importantly, this is not the sole purpose of the 2014 Pre-K Law. In the years following enactment of the 1997 Pre-K Law, it became clear that pre-k programming could benefit many more children than the funding permitted and that the full-day programs were optimal (see New NY Education Reform Commission, Putting Students First: Education{**32 NY3d at 459} Action Plan at 8, 29-30). The elimination of financial obstacles to achieving universal pre-k was a motivating concern behind enactment of the 2014 Pre-K Law (id. at 29 [noting that the Commission "reviewed existing pre-k services in New York and recommended that the state expand its investment to sponsor a full-day model"]; 2014-15 Executive Budget Briefing Book at 1, 5, 29-31 [Jan. 21, 2014] ["The Executive Budget builds upon the success of the first-ever State-funded full-day pre-kindergarten program by committing to invest $1.5 billion over five years to support the phase-in of a Statewide Universal Full-Day Pre-Kindergarten program"]). There was also the additional interest in providing quality programming (see New NY Education Reform Commission, Putting Students First: Education Action Plan at 14, 35-39; Education Law § 3602-ee [1] [providing that the purpose of the program was "to incentivize and fund state-of-the-art innovative pre-kindergarten programs"]).
In any case, petitioners and their supporters misconstrue section 3602-ee (1). Competition coexists with the statutory requirement for accountability. Providers compete to be included in the school district's consolidated program and school districts compete amongst themselves for the grants and with those providers who are not included in the consolidated applications but who apply independently. Moreover, the DOE's contract merely sets forth baseline standards that ensured compliance with the statute and the SED's protocols designed in accordance with the statutory mandates. Nothing in the DOE's contract prohibits a charter school from providing services beyond the minimum threshold set forth in the contract terms. To the extent a charter school wants to pursue a [*18]different approach that a school district rejects, the legislature provides an opportunity for the charter school to secure funding by submitting an individual application and competing for a grant (Education Law § 3602-ee [3]).
IV.
Given that section 3602-ee (12) does not provide charter entities with exclusive oversight of charter schools, the Commissioner properly interpreted the provision, in light of the entire statutory framework, to grant charter entities oversight that is coextensive with the DOE consolidated application grantee. Her interpretation harmonizes subdivision (12) with the SED and school district's inspection authority set forth in subdivision{**32 NY3d at 460} (10), which applies to charter schools given that subdivision (10) applies to all pre-k providers "[n]otwithstanding any provision of law to the contrary" (Education Law § 3602-ee [10]). It also adheres to the accountability framework adopted by the legislature which seeks to achieve delivery of high-quality pre-k programs to all enrolled children. There is nothing irrational or unreasonable in her interpretation.[FN18] Therefore, I would uphold the Commissioner's determination dismissing the petition.
Chief Judge DiFiore and Judges Stein, Fahey and Feinman concur; Judge Rivera dissents in an opinion in which Judge Wilson concurs.
Order affirmed, with costs.

Footnotes

Footnote 1:The eight metrics for quality are: "(a) curriculum; (b) learning environment, materials and supplies; (c) family engagement; (d) staffing patterns; (e) teacher education and experience; (f) facility quality; (g) physical well-being, health and nutrition; and (h) partnerships with non-profit, community and educational institutions" (id.).

Footnote 2:The Universal Pre-K Law also provides for admission procedures and limitations on the employment of uncertified teachers consistent with the Charter Schools Act (Education Law § 3602-ee [12]).

Footnote 3:Success Academy is joined in this appeal by several parents who had enrolled their children in its now-defunct prekindergarten program.

Footnote 4:By that time, DOE had already received approval from SED for approximately $295,000,000—the vast majority of the funding set aside for New York City—to fund 70,000 prekindergarten seats for the 2015-2016 school year.

Footnote 5:The charter entity for Success Academy is the Board of Trustees of the State University of New York.

Footnote 6:The Commissioner deemed unlawful any provisions conflicting with Education Law § 2854 (1) (c) "regarding the authority of the State Comptroller to conduct fiscal audits of charter schools located in New York City" and a provision imposing prevailing wage requirements (see Matter of New York Charter School Assn. v Smith, 15 NY3d 403, 411 [2010]).

Footnote 7:That is not to say that school districts lack such authority over other, non-charter school, prekindergarten providers for which the legislature did not expressly reserve monitoring jurisdiction to another entity.

Footnote 8:Notably, the contractual provision that conflicts most directly with the statutory charter school scheme was belatedly inserted by DOE, and was entirely absent from DOE's sample agreement. That provision purported to give DOE the "right to require [Success Academy] to implement certain curriculum and activities . . . in [DOE's] sole discretion," and provided that "[m]onitoring . . . of [Success Academy programs] will include an assessment of curriculum planning and implementation." The Charter Schools Act, and by extension, the Universal Pre-K Law, prescribe the exact opposite.

Footnote 1:The majority refers to the 1997 legislation as the "Legacy Pre-K Law" (majority op at 
427), a title not found in the legislative text, decisions below, or any briefs submitted on this appeal. The term "legacy" as used by the majority in this context suggests that the 1997 legislation is irrelevant to our analysis of the 2014 legislation titled "statewide universal full-day pre-kindergarten program" (see Merriam-Webster Online Dictionary, legacy [https://www.merriam-webster.com/dictionary/legacy] [defining legacy as "something transmitted by or received from an ancestor or predecessor or from the past"]; majority op at 
428 [describing the program established by the Legacy Pre-K Law as going unfulfilled and describing the 2014 Pre-K Law as a new statutory framework]). To the extent that the 1997 Pre-K Law has not been amended or repealed, no one disputes, including respondents, that the law still carries force (brief for petitioners-respondents at 40-41 [stating that charter school pre-k programs are funded pursuant to Education Law § 3602-e (2)]). To avoid confusion as to the continued relevance of the 1997 law, or erasure of the historical connection between the two statutes, I refer to each law by the year in which it was enacted: the 1997 Pre-K Law and the 2014 Pre-K Law.

Footnote 2:Although the 1997 Pre-K Law refers to a school district's competitive process as the means by which to coordinate proposals from program providers, this describes essentially the same type of process outlined in the 2014 Pre-K Law (Education Law §§ 3602-e [5] [a] [directing schools districts that choose to coordinate proposals for pre-k services to "conduct a competitive process" in accordance with the application process used by the SED to review school district proposals]; 3602-ee [4], [5], [7] [awarding grants to consolidated applications "on a competitive basis"]).

Footnote 3:The SED Commissioner represents that SED considers an individual application from an eligible entity also in those cases where a school district does not submit a consolidated application because the entity has, "in effect, been denied inclusion in a consolidated application" within the meaning of the 2014 Pre-K Law.

Footnote 4:The legislature amended the 1997 Pre-K Law in 2017 to require participating school districts to "adopt approved quality indicators" including "valid and reliable measures of environmental quality, the quality of teacher-student interactions and child outcomes," and to "ensure that any such assessment of child outcomes shall not be used to make high-stakes educational decisions for individual children" (Education Law § 3602-e [17], added by L 2017, ch 59, § 1, part YYY, § 30). This provision, incorporated into the 2014 Pre-K Law, further confirms the central role of school districts as the body responsible for local programmatic oversight (Education Law § 3602-ee [7] [providing that grants will only be awarded to programs that comply with Education Law § 3602-e]).

Footnote 5:Head Start is a federal program managed by the Department of Health and Human Services that funds pre-k education programs for children from low-income households (42 USC § 9831 et seq.).

Footnote 6:ACS is the municipal child welfare agency for New York City that is primarily responsible for providing "foster care placements and services to thousands of children in a broad array of settings" (City of New York v Maul, 14 NY3d 499, 504 [2010]). Its mission is to protect and promote "the safety and well-being of New York City's children, young people, families, and communities by providing excellent child welfare, juvenile justice, and early care and education services" (New York City Administration for Children's Services, Mission & Organization, https://www1.nyc.gov/site/acs/about/mission-organization.page).

Footnote 7:The McClean report was a qualitative study of pre-k teacher compensation parity policies, that obtained data for the 2016-2017 school year through interviews with officers in the SED (Strategies in Pursuit of Pre-K Teacher Compensation Parity at 5, 38 and nn 44, 46).

Footnote 8:This tool was developed by the Frank Porter Graham Child Development Institute and consists of 43 items organized into seven subcategories: space and furnishings, personal care routines, language-reasoning, activities, interactions, program structure, parents and staff (Frank Porter Graham Child Development Institute, Early Childhood Environment Rating Scale, https://ers.fpg.unc.edu/node/324).

Footnote 9:These terms included broad subjective requirements for programs, such as obliging programs to provide age-level appropriate activities and adequate furnishings, as well as objective requirements such as the length of the school year and school day (a minimum of 180 days, for no less than five hours per day), the timing of field trips (no trips before January 1 of the school year and no more than three field trips during the school year), the amount of screen time (no more than 15 minutes per day and no more than 30 minutes per week), and the amount of time students must play independently with art materials, blocks, sand/water, dramatic play items, nature/science materials, books, music materials, and math materials (at least two hours and seven minutes a day).

Footnote 10:Ultimately, the DOE partnered with 277 pre-k providers, including 13 charter schools that did not refuse to execute the contract.

Footnote 11:Since the Success Academy applications are not in the record there is no way to confirm Success Academy's representation that its applications contained an express reservation of rights, or what specific rights it reserved.

Footnote 12:Success Academy does not argue that it could not have followed the process set forth in Education Law § 3602-ee (3), or that it could not have appealed to the Commissioner when it initially responded to the DOE's RFP.

Footnote 13:For the purposes of the grant of funds under the 2014 Pre-K Law, the DOE serves as the "school district."

Footnote 14:The charter entity is responsible for approving a charter school's charter and ensuring its compliance with its charter (Education Law § 2852). A charter entity may be the local school district, Board of Trustees of the State University of New York, or the Board of Regents (Education Law § 2851 [3]). The charter entity for Success Academy is the Board of Trustees of the State University of New York.

Footnote 15:Rather, the primary concern during the passage of the law was the level of funding required for the law (see Ready to Launch at 4-7; NY St United Teachers, Testimony to Senate Fin Comm and Assembly Ways and Means Comm on Education Budget for Elementary and Secondary Education, Jan. 28, 2014 at 4-5; Testimony of NY City Schools Chancellor to Assembly Ways and Means Comm and Senate Fin Comm on Proposed 2014-2015 Budget, Jan. 28, 2014 at 3; Northeast Charter Schools Network, Testimony to Joint Legis Pub Hearing on 2014-2015 Executive Budget Proposal for Elementary and Secondary Education, Jan. 28, 2014).

Footnote 16:Indeed, if, as the majority suggests, charter entities had exclusive oversight of all monitoring, programmatic review, and operational requirements of charter schools, one might plausibly conclude that charter schools cannot seek inclusion in a consolidated application (or apply independently) without authorization of the charter entity. This cannot be so as it is inconsistent with the role charter entities have in overseeing K-12 programs. The CSA grants charter schools broad autonomy over their own policy decisions, and limits the role of charter entities to examining and inspecting schools (Education Law § 2853 [1] [f]; [2]).

Footnote 17:It is noteworthy that at least one of the authorities amici cite to support this position (see e.g. Caroline M. Hoxby et al., How New York City's Charter Schools Affect Achievement, New York City Charter Schools Evaluation Project [2009]) has been reviewed with deep skepticism (see Sean F. Reardon, Review of "How New York City's Charter Schools Affect Achievement," Education and the Public Interest Center, University of Colorado at Boulder, and Education Policy Research Unit, Arizona State University [2009]), and that there is less consensus as to the relative effectiveness of charter schools, on a national scale, than Success Academy and amici suggest (see Tom Loveless & Andrew P. Kelly, Comparing New School Effects in Charter and Traditional Public Schools, 118 Am J Educ 427, 428 [2012] [noting that "(n)o consensus has emerged from dozens of evaluations" on charter schools' impact on test scores]). In addition, charter schools have been criticized for having a neutral or negative impact on the racial and socioeconomic composition of K-12 classrooms (see Erica Frankenberg et al., Choice without Equity: Charter School Segregation, 19 Educ Pol'y Analysis Archives 1, 6-8 [2011] [reviewing charter school enrollment in 40 states and finding that charter schools are more racially isolated than traditional public schools]). As discussed above, one of the benefits driving the push for universal pre-k in New York and elsewhere was the understanding that expanding access to pre-k would place more children in racially and socioeconomically diverse classrooms.

Footnote 18:Since I conclude that our rules of statutory construction do not allow for the construction of Education Law § 3602-ee (12) as advocated by petitioners, I have no occasion to consider whether the Commissioner's interpretation must be considered under our rules of administrative deference.