Matter of T-Mobile Northeast, LLC v DeBellis (2018 NY Slip Op 08539)

Matter of T-Mobile Northeast, LLC v DeBellis

2018 NY Slip Op 08539 [32 NY3d 594]

December 13, 2018

DiFiore, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, March 20, 2019

[*1]

In the Matter of T-Mobile Northeast, LLC, Appellant,
v
Anthony V. DeBellis, as Commissioner of Assessment of the City of Mount Vernon, et al., Respondents, et al., Respondents/Defendants.

Argued November 15, 2018; decided December 13, 2018

Matter of T-Mobile Northeast, LLC v DeBellis, 143 AD3d 992, affirmed.

{**32 NY3d at 598} OPINION OF THE COURT

Chief Judge DiFiore.

This dispute over whether certain telecommunications equipment is taxable property comes to us in the wake of historic and fundamental changes in the telecommunications industry during the last century prompting a legislative overhaul of the Real Property Tax Law, including the enactment of RPTL 102 (12) (i). Under that statute, certain "lines, wires, poles, supports and inclosures for electrical conductors" used for transmission of electromagnetic data qualify as taxable real property. We are asked to decide whether certain large cellular data transmission equipment owned by petitioner T-Mobile Northeast, LLC and mounted to the exterior of buildings{**32 NY3d at 599} throughout its service area in Mount Vernon constitutes taxable real property under the RPTL. Because we agree with respondent tax authorities and the Appellate Division that the equipment is taxable pursuant to RPTL 102 (12) (i), we affirm the Appellate Division order.
I.
To provide necessary context for the discrete statutory interpretation issue at the heart of this appeal, we review the evolution of the statutory scheme and the events that have driven it. The telecommunications industry [*2]operated as a regulated monopoly until the divestment of American Telephone & Telegraph Company (AT&T) in 1982. Prior to that critical shift, AT&T dominated the market, supplying almost all telephone service nationwide. Long-distance service was provided through its Long Lines department and local exchange service through the Bell System—a network of subsidiary operating companies, each serving a different geographic region.
During this period, the network of equipment constituting the telephone system was generally taxable under the RPTL. Former RPTL 102 (12) (d) defined as taxable real property "[t]elephone and telegraph lines, wires, poles and appurtenances; supports and inclosures for electrical conductors and other appurtenances, upon, above and under ground." Prior to 1975, the term "appurtenances" was broadly interpreted to encompass essentially all equipment involving use of telephone lines, whether located on telephone company property or customer premises, even when it was detachable and otherwise would have been treated as personalty (see State Board of Equalization and Assessment, Report to Governor Mario M. Cuomo on the Taxation of Telecommunications Property at 6 [Jan. 1985], available at 
https://www.tax.ny.gov/pdf/publications/orpts/taxation_telecommunications_prop.pdf, cached at 
http://www.nycourts.gov/reporter/webdocs/TelecomReport.pdf [hereinafter 1985 SBEA Report]; see also Matter of Crystal v City of Syracuse, Dept. of Assessment, 47 AD2d 29, 31 [4th Dept 1975], affd 38 NY2d 883 [1976], citing Matter of New York Tel. Co. v Ferris, 257 App Div 415, 416 [4th Dept 1939], affd 282 NY 667 [1940], and Matter of New York Tel. Co. [Canough], 290 NY 537 [1943]). Until 1969, these taxable "appurtenances" were typically owned by the telephone utility because the Federal Communications Commission (FCC) required that a telephone company furnish all equipment connected{**32 NY3d at 600} to its service (see FCC Tariff No. 132). Thus, telephones, private branch exchanges, and associated wiring on customer property—referred to in the industry as "customer premises equipment" (CPE)—were owned by the telephone utility that owned the lines supplying service and whatever equipment it connected to the service on its own property.
However, beginning in the 1960s, a series of regulatory and legal changes resulted in greater competition in the telecommunications markets, leading to significant restructuring of the industry. This, in turn, raised questions about the taxability of certain equipment. First, the FCC invalidated the requirement that telephone customers use only utility-issued equipment, allowing customers to connect privately-purchased or leased telephones at their premises (see In the Matter of Use of the Carterfone Device in Message Toll Tel. Serv., 13 FCC2d 420, 425 [1968]). Then, in 1976, in Matter of Crystal v City of Syracuse, Dept. of Assessment (38 NY2d 883, 885 [1976]), we affirmed an Appellate Division order holding that customer-owned telephones were not taxable under RPTL 102 (12) (d), at least where not "incorporated as part of the real estate." As the Appellate Division explained in Crystal, when it enacted RPTL 102 (12) (d), the legislature intended to expand the definition of real property when owned by a utility (Matter of Crossman Cadillac v Board of Assessors of County of Nassau, 44 NY2d 963, 964 [1978], citing Crystal, 47 AD2d at 31). Thus, under this interpretation of section 102 (12) (d), equipment that would not be taxable if owned by the customer or leased to the customer by a non-utility was taxable when owned by a telephone utility.
After Crystal, the scope of RPTL 102 (12) (d) was narrowed even further by judicial decisions holding that it did not encompass a removeable system of privately-owned telephone equipment on customer premises (Crossman Cadillac, 44 NY2d at 964-965) or cable television equipment owned by a television company (Matter of Manhattan Cable TV Servs., Div. of Sterling Info. Servs. v Freyberg, 49 NY2d 868 [1980]; see also Matter of Cablevision Sys. Dev. Co. v Board of Assessors of County of Nassau, 98 AD2d 818 [2d Dept 1983]; Matter of American Cablevision of Rochester v Jacobs, 101 AD2d 65 [4th Dept 1984]). Thus, by 1984, only utility-owned equipment was taxable under RPTL 102 (12) (d). Additionally, technological advancements and deregulation in the CPE and telephone service markets resulted in a more diverse range of property owners{**32 NY3d at 601} in the industry, which—because the taxable status of certain equipment turned on its ownership by traditional utilities—further threatened the tax base and created a system of unequal taxation.
Throughout this period, AT&T was the target of antitrust litigation resulting in a settlement under which AT&T would divest itself of its Bell System local-service operating companies (United States v American Tel. & Tel. Co., 552 F Supp 131, 140-141 [D DC 1982]). Thereafter, AT&T provided only long-distance service and the Bell System operating companies reorganized as independent regional companies providing local service. In addition to accelerating the growth of competition spawned by deregulation, the divesture further complicated taxation of CPE. The FCC permitted AT&T to participate in the deregulated, competitive CPE market only through a fully separated subsidiary—AT&T Information Systems (ATTIS) (see Matter of Procedures for Implementing the Detariffing of [*3]Customer Premises Equip. & Enhanced Servs. [Second Computer Inquiry], 95 FCC2d 1276 [1983]). The CPE owned and leased to customers by ATTIS was not taxable under New York law because the subsidiary was not a utility—but CPE leased by telephone utilities not required to use a subsidiary was taxable (1985 SBEA Report at 9).
Because the transfer of CPE to ATTIS threatened to significantly impact state tax revenue, the legislature enacted a temporary measure in 1984 providing that any CPE and central office equipment taxable in 1983 that was transferred to another owner engaged in the sale or lease of such equipment (such as ATTIS) would be taxable "notwithstanding whether such transferee is considered a utility" (L 1984, ch 895). That same year, ATTIS brought an equal protection challenge asserting that the statute was discriminatory because it treated ATTIS differently from other CPE owners and suppliers—a challenge that was ultimately sustained (AT&T Info. Sys. v City of New York, 137 AD2d 7 [1st Dept 1988], affd AT&T Info. Sys. v City of New York, 73 NY2d 842 [1988]).
II.
Thus, throughout the 1970s and early 1980s, the propriety of the RPTL's treatment of telecommunications equipment had{**32 NY3d at 602} increasingly come under scrutiny and the scheme's apparently unequal treatment of different types of owners was called into doubt. The State sought to clarify the taxability of such property and to develop a comprehensive legislative solution. At the direction of the Governor, after meeting with industry representatives, academics, and government officials, the State Board of Equalization and Assessment (SBEA) issued a 1985 report with recommendations to address the problem (1985 SBEA Report at 1). The SBEA Report acknowledged that the definition of real property as to telecommunications equipment "ha[d] become confused over the years," concluding that "the trend of judicial construction of section 102(12)(d) of the [RPTL] ha[d] sorely undermined the in rem concept of real property taxation in New York State" (1985 SBEA Report at 2). The SBEA specifically criticized the distinction the courts had drawn between utility-owned and non-utility-owned equipment, characterizing it as "artificial" (1985 SBEA Report at 7). Thus, the SBEA proposed a "[l]egislative restoration of common law notions of real property" (1985 SBEA Report at 2).

To that end, the SBEA recommended a change in the State's governing philosophy relating to the taxation of telecommunications equipment, shifting from a system of taxation based on the identity of the owner (i.e., property is taxed when owned by telephone utilities) to a system based on "type and use of property," resulting in greater uniformity of taxation (1985 SBEA Report at 2). The Report suggested that a distinction be drawn between (i) the telephone lines and related equipment, installed outside, and (ii) the equipment in telephone company offices and on customer property that is connected by the outdoor telephone lines. The proposal was that the first category—consisting of "[l]ines, wires, cables, poles and other such property which is not located on a customer's premises, known in the industry as 'outside plant' " and is used to "transmit[ ] the signals from sender to receiver"—should be treated as taxable real property regardless of what type of entity owned the property (1985 SBEA Report at 3, 15-16). Explaining that outside plant has "historically been taxed as realty," the SBEA lamented that recent court decisions treated cable owned by television companies as non-taxable, despite the fact that it "seem[ed] to satisfy the traditional definition of taxable real property" (1985 SBEA Report at 15-16).
The SBEA also recommended that certain property previously taxed as "appurtenant" to the telephone system under {**32 NY3d at 603}RPTL 102 (12) (d)—even though it more resembled personalty than realty—be treated as non-taxable: CPE and central office equipment (1985 SBEA Report at 14-15).[FN1] The Report explained that CPE was furnished by a range of suppliers, including non-utilities, but only taxed as realty when owned by a utility company (1985 SBEA Report at 15). Because the SBEA believed that ownership by a particular type of entity was no longer a proper basis for taxation, it recommended ending taxation of CPE altogether. With respect to central office equipment, defined as "switchgear located in the central office buildings of the companies providing telecommunications services" used to take subscribers' calls or route them to the intended recipient (1985 SBEA Report at 14), the Report explained that this category of equipment, while previously owned almost entirely by telephone companies, was now held by a range of owners (1985 SBEA Report at 14). Based on this development and technological advancements in the equipment, the SBEA opined that taxation of this category would no longer "comport with the common law notions of real property, i.e., land and structures affixed to the land" (1985 SBEA Report at 14-15). In keeping with its stated [*4]goals, the Report generally recommended (i) preserving or restoring the taxable status of "outside plant," which aligned with the traditional notion of real property as structures, and (ii) excluding from taxation equipment analogous to personal property traditionally not subject to real property taxes, which was increasingly owned by non-utilities.
In the wake of the SBEA report, the legislature enacted temporary measures in 1985 largely consistent with the SBEA's recommendations. The statutes, in part, provided for taxation of non-utilities' outside plant under a predecessor version of paragraph (i) and generally repealed taxes on CPE (Budget Report on Bills at 2, Bill Jacket, L 1987, ch 416, citing L 1985, chs 71, 72, 463). However, central office equipment owned by local exchange telephone companies continued to be taxable (id.). Additionally, the 1985 version of paragraph (i) defined as taxable real property a particular category of non-utility-owned CPE that served a function similar to central office equipment—termed "telecommunications equipment" (1987 Temporary State Commission on Real Property Tax Report [hereinafter, 1987 Commission Report] at 19-20). Specifically,{**32 NY3d at 604}former RPTL 102 (12) (i) provided for taxation of "[t]elecommunications equipment, which shall mean and include equipment used to provide transmission or switching of electromagnetic voice, video and data signals between different entities separated by air, street or other public domain, and related equipment necessary to the operation of such equipment or the modification of such signals required by such equipment," in addition to outside plant—identified as "lines, wires, poles, supports and inclosures for electrical conductors . . . used in connection therewith." Thus, former paragraph (i) taxed non-utility-owned "telecommunications equipment" on customer premises that was independently capable of transmitting and switching signals, like the utility-owned switchgear described as central office equipment also taxed under the 1985 legislation (1987 Commission Report at 19-20).
The 1985 statutes were set to expire at the end of 1986 and directed that a Temporary State Commission on the Real Property Tax (Commission) make further recommendations (Budget Report on Bills at 2, Bill Jacket, L 1987, ch 416). In 1987, the Commission concluded—consistent with the SBEA's report—that central office equipment and similar switching and transmission equipment on customer premises (the "telecommunications equipment" taxable under the 1985 legislation) was characteristic of personal property and, thus, taxation of these categories of property should be phased out (1987 Commission Report at iii). Further legislation was passed in 1987 effectuating these recommendations.
The 1987 legislation included the current version of RPTL 102 (12) (i), which—like its predecessor—addresses property not owned by a utility. In keeping with the Commission's recommendation, the current version of paragraph (i) omitted the category of "telecommunications equipment" that consisted of transmission and switching equipment on customer premises. The 1987 legislation also repealed the prior version of RPTL 102 (12) (d) and replaced it with a provision that encompasses utility-owned outside plant (as the former version did) but excludes utilities' "appurtenances"—CPE and central office equipment. Although the current version of paragraph (i) omits "telecommunications equipment," it still identifies as taxable "lines, wires, poles, supports and inclosures for electrical conductors"—i.e., outside plant (RPTL 102 [12] [i]; see L 1987, ch 416). Because outside plant owned by utilities is taxable under RPTL 102 (12) (d), and outside plant owned by non-{**32 NY3d at 605}utilities is taxable under RPTL 102 (12) (i), the 1987 legislation ensures equal taxation of outside plant regardless of what type of entity owns the equipment. Further, rather than subjecting local governments to a sharp decrease in revenue based on the exclusions for central office equipment and "telecommunications equipment," the legislature phased out taxation of that equipment over five years.
The legislative materials accompanying the bill indicate that it was intended to remedy confusion in the RPTL as to taxation of equipment used for telecommunications by adopting clear distinctions based not on characteristics of the owner but on type and use. The intent was that equipment of a type that comported with traditional conceptions of real property be taxable, but not equipment that would be considered personalty under the common law (see Div. of Equalization and Assessment Mem in Support at 2, Bill Jacket, L 1987, ch 416; see also Budget Report on Bills at 4, Bill Jacket, L 1987, ch 416). Although the 1987 legislation was intended to clarify the scope of taxation of property used for telecommunications, some controversy has persisted as reflected in the instant litigation.
III.
[*5]T-Mobile owns large cellular data transmission equipment that it has installed on the exterior of buildings in Mount Vernon. The installations—which are large enough to require the use of "stealth walls" that shield them from view—consist of multiple pieces of interconnected equipment, including base transceiver stations (essentially cabinets housing wiring and providing battery power); antennas that transmit and receive the signals; and coaxial, T-1, and fiber-optic cables running amongst the other components. T-Mobile enters multi-year leases with the owners of the buildings to enable it to occupy the exterior space on the buildings for installation of the equipment. Respondents/defendants are Anthony V. DeBellis, as Commissioner of Assessment of the City of Mount Vernon, the Mount Vernon City Council, and the City of Mount Vernon (collectively the City), and the Board of Education for the Mount Vernon City School District and the Mount Vernon City School District (collectively the School District). After the City and School District separately assessed real property taxes on this equipment, T-Mobile filed applications to correct the tax rolls and to receive refunds of taxes paid, asserting that the equipment is not taxable real property and that the taxes, therefore,{**32 NY3d at 606} were illegal. The School District denied the applications on the merits, determining that the property is taxable. The City did not respond.
T-Mobile brought this hybrid declaratory judgment action and CPLR article 78 proceeding seeking a declaration that the property is not taxable and a judgment annulling the School District's contrary determination. T-Mobile argued that its property is not taxable under either paragraph (i) or RPTL 102 (12) (b)—which addresses taxation of "fixtures." Rather, T-Mobile claimed its installations fall within categories of property phased out from taxation in 1987 or constitute "station connections" excepted from taxation in paragraph (i). The School District answered, arguing, as relevant to this appeal, that the property is encompassed by paragraph (i) based on the plain text of that provision and its legislative history and, alternatively, that certain components of the equipment are fixtures and thus taxable under RPTL 102 (12) (b). The City moved to dismiss, raising untimeliness and other procedural objections, echoing the School District's argument that the equipment is taxable under paragraph (i). Supreme Court, among other things, denied the petition and dismissed the proceeding, holding that the property in question is taxable under the RPTL (2013 NY Slip Op 34102[U] [Sup Ct, Westchester County, Nov. 15, 2013]). Supreme Court concluded that the legislative history cited above indicates that T-Mobile's equipment is taxable under paragraph (i).
The Appellate Division affirmed, insofar as appealed from, reasoning that under the plain text of the statute each component of T-Mobile's equipment is taxable under RPTL 102 (12) (i) (143 AD3d 992 [2d Dept 2016]), although recognizing that this conclusion conflicted with Matter of RCN N.Y. Communications, LLC v Tax Commn. of the City of N.Y. (95 AD3d 456, 457 [1st Dept 2012]). The Appellate Division further noted that even if RPTL 102 (12) (i) did not apply here, the antennas that are part of the equipment installations at issue are structures that are "affixed" to real estate under the common-law definition of "fixtures," and thus are taxable real property under RPTL 102 (12) (b) (143 AD3d at 995-996). We granted T-Mobile leave to appeal (30 NY3d 906 [2017]).
In this Court, T-Mobile re-asserts its argument that the equipment does not qualify as taxable real property under either RPTL 102 (12) (i) or (b), relying on the 1987 phaseouts and the exception in paragraph (i) for "station connections." {**32 NY3d at 607}T-Mobile contends that the Appellate Division erred in declining to resolve ambiguities in the statute in favor of the taxpayer. Respondents contend that the courts below properly held that the property is taxable under both RPTL 102 (12) (i) and (b) and that the phaseouts and exceptions cited by T-Mobile do not apply.
IV.
It is clear from the plain language and legislative history of paragraph (i) that T-Mobile's arguments lack merit. We begin with the plain language of the statute, which is the clearest indicator of legislative intent (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). Under the RPTL, all "real property within the state" is subject to real property taxation unless otherwise exempt by law (see RPTL 300). "Real property" is defined under subdivision (12) of RPTL 102. Under RPTL 102 (12) (i), that term includes:
"When owned by other than a telephone company as such term is defined in paragraph (d) hereof, all lines, wires, poles, supports and inclosures for electrical conductors upon, above and underground used in connection with the transmission or switching of electromagnetic voice, video and data signals between different entities separated by air, street or other public domain."
[*6]
The statute also contains four exceptions excluding certain types of property from taxation, including "station connections."[FN2] The parties agree that T-Mobile is not a "telephone company"—which refers to certain companies providing non-cellular local exchange service—and thus its equipment is taxable under paragraph (i) to the extent it qualifies under the language of that provision.
The plain language of paragraph (i) encompasses each component of T-Mobile's data transmission equipment, which consists of base transceiver stations; antennas; and coaxial, T-1, and fiber-optic cables. The base transceiver stations are essentially cabinets that house cables and other electrical{**32 NY3d at 608} components and provide battery power, so they qualify as "inclosures for electrical conductors." The large rectangular antennas are part of the base transceiver stations and, thus, also "inclosures for electrical conductors." The various cables in the installations are "lines" and/or "wires" under the plain text of the statute. Because the primary function of the equipment installations is to transmit cellular data, the components are "used in connection with the transmission or switching of electromagnetic voice, video and data signals between different entities separated by air, street or other public domain," as required by the statute. Thus, although ambiguities in tax statutes are generally resolved in favor of the taxpayer (Freyberg, 49 NY2d at 869), that doctrine is not implicated here because the plain text of RPTL 102 (12) (i) unambiguously indicates that T-Mobile's equipment installations are taxable real property.
T-Mobile argues that the phrase "for electrical conductors" modifies all of the types of equipment listed as taxable in paragraph (i), relying on Matter of RCN N.Y. Communications, LLC (95 AD3d at 457). But we agree with the Appellate Division that the last antecedent rule of statutory construction applies here. Under that rule, "[r]elative and qualifying words or clauses in a statute are to be applied to the words or phrases immediately preceding, and are not to be construed as extending to others more remote" (Dunlea v Anderson, 66 NY2d 265, 269 [1985] [citation and internal quotation marks omitted]; cf. A.J. Temple Marble & Tile v Union Carbide Marble Care, 87 NY2d 574, 581 [1996]). Therefore, the phrase "for electrical conductors" modifies only "inclosures"—the last noun in the list of equipment in section 102 (12) (i), and the provision encompasses (when not owned by a local utility) lines, wires, poles, and supports, regardless of whether they are related to the conduction of electricity, as well as "inclosures for electrical conductors," when those items are used in the transmission of data signals across public domain. Thus, T-Mobile's fiber-optic cables are taxable as "lines" under the statute despite the fact that they do not conduct electricity.
Moreover, contrary to T-Mobile's assertion, the 1987 phaseouts from taxation do not apply. The phaseouts were intended to soften the effect of the legislature's exclusion of central office equipment and "telecommunications equipment" from taxation (Budget Report on Bills at 3, 5, Bill Jacket, L 1987, ch 416). The central office equipment phaseout related to property located{**32 NY3d at 609} in the "central office" of a telephone company, which plainly does not encompass the large equipment installations at issue here, which are mounted to the outside of buildings dispersed throughout T-Mobile's Mount Vernon service area. Although "telecommunications equipment" is a broad term on its face, it has a specific meaning in the context of the 1987 legislation—transmission and switching equipment similar to central office equipment on customer premises, which had been taxable under the 1985 legislation (1987 Commission Report at 18-20). It is clear from the relevant legislative materials that the property rendered non-taxable was not outside plant like T-Mobile's equipment but property covered by the term "appurtenances" that had traditionally been expansively defined to include "personalty installed upon a customer's premises or that of the service provider" (Div of Equalization and Assessment Mem in Support at 2, Bill Jacket, L 1987, ch 416). Although [*7]T-Mobile contends that the 1987 legislation ended taxation on all "telecommunications equipment" as that term is commonly understood, such a conclusion would conflict with the plain text of section 102 (12) (i)—which clearly taxes certain types of property used for telecommunications.
T-Mobile's argument that its equipment falls under the paragraph (i) exception for "station connections" also lacks merit. The term "station connections" is not defined in the statute. But it is clear from the pertinent SBEA memoranda that "station connections" is a term of art referring to "inside wires" and "the wire 'connecting items of station apparatus' " like "desk sets, hand sets and wall sets ('plain old telephone'), amplifying equipment, mobile telephone equipment, small private branch exchanges and teletypewriter equipment" (SBEA Explanation of Terminology at 3-4, Bill Jacket, L 1987, ch 416), including "drop wires from the telephone pole to the block and wires from the block to the house wire" (Feb. 1, 1984 SBEA Mem attached to 1985 SBEA Report at 2). Thus, this exception relates to wiring physically connecting customer telephones to telephone poles and does not encompass the equipment at issue here—large outdoor installations including fiber optic cables and antennas.
Indeed, it appears that T-Mobile's equipment is precisely the type of property the legislature intended to cover when it substantially revised the RPTL in 1987. At that time, the legislature sought to adopt a consistent scheme of taxation that did away with the artificial distinctions that pervaded the{**32 NY3d at 610} former statutory scheme, as it had been interpreted by the courts. To that end, instead of basing taxation on the characteristics of the owner (utility versus non-utility), the legislature focused on the nature and function of the property. It ended taxation of CPE and central office equipment that—although akin to personal property—had been taxable under the RPTL when owned by a utility but not taxable if owned by a customer or non-utility. At the same time, it ensured taxation of outside plant, which it viewed as real property in the traditional in rem sense, but which courts had deemed not taxable unless owned by a utility. While office switchgear used to send and receive signals and small, moveable equipment like telephones were excluded, lines and other outdoor equipment that transmit signals between those end points were deemed taxable. Because the property at issue here consists of lines that transmit signals between users across public domain, taxation of this property comports with the plain text of paragraph (i) and the legislative intent underlying the adoption of the post-1987 statutory scheme.
Because we conclude that T-Mobile's equipment is taxable under RPTL 102 (12) (i), we need not address whether it is taxable under RPTL 102 (12) (b). T-Mobile's constitutional challenge is not preserved for review. In light of our disposition on the merits, we do not reach the City's proffered alternative ground for affirmance.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Judges Rivera, Stein, Fahey, Garcia, Wilson and Feinman concur.
Order affirmed, with costs.

Footnotes

Footnote 1:The SBEA and legislative materials also refer to CPE as "station equipment" (see 1985 SBEA Report at 2).

Footnote 2:The statute provides:
"except that such property shall not include: (A) station connections; (B) fire and surveillance alarm system property; (C) such property used in the transmission of news wire services; and (D) such property used in the transmission of news or entertainment radio, television or cable television signals for immediate, delayed or ultimate exhibition to the public, whether or not a fee is charged therefor" (RPTL 102 [12] [i]).