Matter of West 58th St. Coalition, Inc. v City of New York (2020 NY Slip Op 04521)





Matter of West 58th St. Coalition, Inc. v City of New York


2020 NY Slip Op 04521


Decided on August 13, 2020


Appellate Division, First Department


Singh, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 13, 2020
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
Dianne T. Renwick
Jeffrey K. Oing
Anil C. Singh, JJ.


156196/18 10421 

[*1]In re West 58th Street Coalition, Inc., et al., Petitioners-Appellants,
v
City of New York, et al., Respondents-Respondents.



Petitioners appeal from the judgment of the Supreme Court,
New York County (Alexander M. Tisch, J.), entered April 29, 2019, denying the petition to annul a determination of respondents to open a shelter at 158 West 58th Street in Manhattan, and dismissing the proceeding brought pursuant to CPLR article 78.




Rivkin Radler LLP, New York (Jeremy B. Honig and Cheryl F. Korman of counsel), for appellants.
Georgia M. Pestana, Acting Corporation Counsel, New York (Barbara Graves-Poller and Aaron Bloom of counsel), for respondents.



SINGH, J.


We are asked to decide whether respondents properly permitted the opening of an employment shelter for homeless men in midtown Manhattan. We find that respondents rationally determined that the subject building is a Class A multiple dwelling in the "R-2" occupancy group which represents a continuation of a preexisting use group classification and is grandfathered from compliance with the current New York City Building Code (Administrative Code of City of N.Y. [Building Code] § 310.1). However, we conclude that petitioners have rebutted the presumption that the building as currently configured will not endanger the general safety and welfare of the public. Accordingly, we remand this matter to Supreme Court for further proceedings.
The Park Savoy Hotel
The building, formerly known as the Park Savoy Hotel located at 158 West 58th Street in Manhattan (the building), was constructed in 1910 and is nine stories tall, with a penthouse and cellar. In 1942, the Building received a permanent certificate of occupancy (CO) as a new law tenement, single room occupancy (SRO). The CO specified use of the first floor for one apartment and two doctor's offices, the second to ninth floors for 13 SRO rooms with two kitchens on each floor, and the penthouse for one SRO room.
In violation of the CO, the Building was used as a hotel on the upper floors, with restaurants on the ground floor, from 1994 until 2014. In January 2014, the owner, respondent New Hampton, LLC filed an alteration plan with respondent New York City Department of Buildings (DOB) to convert the Building from an SRO to "transient hotel with commercial first floor." DOB rejected the plan in November 2016, and New Hampton withdrew the application in June 2018.
The Employment Shelter
Thereafter, New Hampton decided to seek permission to use the Building as a shelter. The City referred New Hampton to respondent Westhab, Inc., a nonprofit provider of housing and services for the homeless. On May 1, 2017, Westhab submitted a proposal to respondent Department of Homeless Services (DHS) to operate a shelter in the Building for 150 employed or job-seeking men. In addition to rooms, the shelter would provide residents with food, laundry services, employment services, and housing placement support.
On February 2, 2018, the City published a notice of its intention to enter into a contract with Westhab. The City held public hearings to inform the community of its plans and to hear their input. At the hearings, petitioners expressed their opposition to the creation of a shelter in their neighborhood. They felt that the neighborhood had been singled out as "a grand social experiment"; the planned project would violate the rights of people "who work all day and pay their taxes" by reducing homeowners' property values; and that the City was putting them "in danger because you're going to put 150 people in a small area, which will increase crime and the threat of crime and danger."[FN1]
[*2]The New York City Building Code The current New York City Building Code promulgated in 2008 and revised in 2014 (the current Code) supplemented the prior 1968 Building Code (the prior Code). Existing buildings are generally exempt from the provisions of the current Code unless there is substantial renovation or change in use (Administrative Code [Building Code] § 27-120).
The statute enumerates 19 categories of alterations that, under specific circumstances, require a building owner to complete renovations in accordance with the current Code, rather than earlier laws. The current Code also contains grandfathering provisions which allow buildings built prior to 2008 to remain subject to the laws applicable prior to 2008, including the Multiple Dwelling Law (Administrative Code [Building Code] §§ 28-102.4, 27-103). The applicability of the grandfathering provisions depends largely on whether any alteration work results in a change of use or occupancy group classification of a building (Administrative Code [Building Code] § 28-101.4.3[2] [whenever a building undergoes a change in use or occupancy, the building's owner must alter the fire protection system in accordance with the current Code, subject to special provisions for prior code buildings as set forth therein]). The current Code changed the names of certain occupancy groups, replacing "J-2" with the "R-2" occupancy group.
DOB's Assessment of the Building
DOB identified that under the prior Code, the Building was a tenement SRO and therefore in the "J-2" occupancy group. DOB determined that the preexisting occupancy group classification of the Building was equivalent to the "R-2" occupancy group under the current Code, as a Class A multiple dwelling nontransient "apartment hotel" (Administrative Code [Building Code] § 28-310.1.2; Multiple Dwelling Law § 4[8][a]).
DOB gathered facts to determine whether the Building's use and occupancy class would change as a result of the proposed renovations. Relying on the data DHS supplied that residents would remain in the shelter for, on average, well above 30 days, DOB determined that the Building should be classified as an "R-2" "Class A" multiple dwelling under the current Code and the Multiple Dwelling Law. DOB also classified the Building within "Use Group 2" of the Zoning Resolution (Zoning Resolution §§ 12-10, 22-10).
DOB explained that it arrived at the "R-2" classification by analyzing three other employment shelters throughout the City and concluded that the residents at these shelters were unlike residents of other DHS facilities, in part due to Westhab's residents' "unique stability" and "non-transient nature." This fact-intensive inquiry also required DOB to make a specific assessment of the Building's history, construction, design features, its planned future use and occupancy, as well as the proposed alterations.
In December 2017, New Hampton filed another alteration plan with DOB to amend the Building's number of dwelling units and change its use and occupancy to "R-2 residential: apartment houses." On April 6, 2018, DOB approved New Hampton's plan to maintain the existing single egress from the Building, through the lobby, in conformity with Multiple Dwelling Law §§ 4 and 248. On April 24, 2018, DOB approved Westhab's December 2017 [*3]alteration plan. A work permit was issued in May 2018. That same month, DHS issued a "Negative Declaration," stating that the shelter would not generate any significant adverse environmental impact, and the City issued a "Fair Share" statement, finding that the shelter would not significantly alter the concentration of similar facilities or otherwise adversely affect the area.
Petitioners' Article 78 Challenge
On July 2, 2018, petitioners, a number of neighborhood residents and organizations, commenced this article 78 proceeding in Supreme Court. Petitioners argued that, as a shelter, the Building should have been classified in the "R-1" occupancy group under the current Code; that alterations to the Building had been performed illegally and were improperly approved by respondents; and that the Building was dangerous and a fire trap. In support of the petition, petitioners submitted, among other things, five expert affidavits.[FN2]
While the proceeding was pending, on September 4, 2018, DOB issued a temporary certificate of occupancy (TCO) for the Building's cellar through fourth floors. DOB conditioned the TCO on New Hampton maintaining two certified fire guards, pending installation of additional sprinklers on each floor and confirming that the building was constructed of fireproof, noncombustible materials. DOB renewed the TCO at 90-day intervals.
Both the City of New York and Westhab served answers denying the petition's material allegations and asserting affirmative defenses. In support of its answer, the City submitted three expert affidavits [FN3]. Westhab also submitted one expert affidavit detailing Westhab's fire safety and security plans.
Supreme Court denied the petition in its entirety and dismissed the proceeding. The court found [*4]that there was a rational basis for respondents' decision to open a shelter in the Building and to classify it as an "R-2" under the applicable laws, on the basis that the residents were nontransient and would stay on average for more than 30 days.
Further, since a partial TCO was issued, the court concluded that the Building was safe to be inhabited. The court reasoned that although "respondents did not submit any affirmative evidence from a City representative specifically stating that the building and proposed plans would not endanger' the general safety and public welfare,' it is not required to do so," under the plain reading of the applicable statutes regarding the issuance of a TCO.
Supreme Court rejected petitioners' core argument that the Building violated the current Code and was unsafe, and its arguments that the City's fair share and environmental reviews were deficient [FN4]. The court noted that it was obligated to defer to the City's and its agencies' determinations "even if it were inclined to reach a different result." This appeal ensued.
Discussion
Standing
As a threshold matter, we find that respondents' argument that petitioners lack standing to challenge the opening of the shelter in the Building is without merit. Here, since petitioners live within a few blocks of the proposed shelter, they have standing to raise the safety-based objections concerning it (see Matter of Committee to Preserve Brighton Beach & Manhattan Beach v Planning Commn. of City of N.Y., 259 AD2d 26, 32-33 [1st Dept 1999] [individuals living in close proximity to a public park had standing to challenge agency decision to grant concession for operation of private recreation center there]; see Matter of Manupella v Troy City Zoning Bd. of Appeals, 272 AD2d 761, 761-762 [3d Dept 2000] [persons living within 714 feet had standing to raise claims that proposed homeless shelter would adversely impact neighborhood health and safety with increased crime, disruptive conduct, "risk of fire," and decreased real estate values]).
Grandfathering
Petitioners contend that DOB's determination that the current Code's grandfathering provisions should apply to the Building is arbitrary and capricious. We disagree.
It is well settled that reviewing courts may not disturb an agency's determination unless it is arbitrary and capricious, affected by an error of law, or an abuse of discretion (CPLR 7803[3]). In the seminal case of Kurcsics v Merchants Mut. Ins. Co. (49 NY2d 451 [1980]), the Court of Appeals explained that
"[w]here the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom, the courts regularly defer to the governmental agency charged with the responsibility for administration of the statute. If its interpretation is not irrational or unreasonable, it will be upheld. Where, however, the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations are therefore to be accorded much less weight. If the regulation runs counter to the clear wording of a statutory provision, it should not be accorded any weight" (id. at 459 [internal citations omitted]).
It is axiomatic that we defer to an agency's fact-based application of a statute in its [*5]specialized area of expertise (see Matter of Mech. Constrs. Ass'n. of N.Y. v N.Y. City Dept. of Bldgs., 128 AD3d 565, 566 [1st Dept 2015] [DOB's determination was rationally based and entitled to deference]; Matter of Lite View, LLC v New York State Div. of Hous. & Community Renewal, 97 AD3d 105, 108 [1st Dept 2012] [applications to reduce or alter dwelling space pursuant to the Rent Stabilization Code are fact-specific and the court appropriately deferred to the Department of Housing and Community Renewal's determination]).
Moreover, we may not "substitute [our] judgment in place of the judgment of the properly delegated administrative officials" (Matter of Save America's Clocks, Inc. v City of New York, 33 NY3d 198, 210 [2019][internal quotations marks omitted]). Accordingly, if we find that the determination is supported by a rational basis, we must sustain the agency determination even if the Court concludes that it would have reached a different result (Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009]).
We reject petitioners' argument, adopted by the concurrence, that DOB's determination is rooted in the misapplication of pure questions of law. The determination involved specialized "knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom" (Kurcsics, 49 NY2d at 459 [1980]). Based on the finding that the Building would be used as a nontransient employment shelter, DOB rationally determined that the Building would be classified as a Class A Multiple Dwelling under the Housing Maintenance Code (Administrative Code [Housing Maintenance Code] § 27-2004[a][8][a]; Multiple Dwelling Law § 4[8]) and is thus properly classified as "R-2" under the current Code (Administrative Code [Building Code] § 28-310.1.2) as an "apartment hotel (nontransient)". This classification represents a continuation of the Building's classification under the prior Code, which in turn was a new law tenement SRO, and a Class A Multiple Dwelling "apartment hotel," under the 1942 CO (see Multiple Dwelling Law § 4[8][a]). The decision is based on DHS's factual determination that the Building residents, on average, will be occupying the units for more than 30 days, and are thus nontransient.
Petitioners assert that DOB's finding is inconsistent with the function of a shelter as a short-term housing solution. However, the record is replete with factual data that DHS used in reaching its conclusion. For example, in her affidavit, the First Deputy Commissioner for DHS, Jacqueline Bray, states that the single adult men usually stay more than 30 days because DHS must conduct several assessments of each client to determine the most appropriate pathway to permanent housing; develop a housing plan; permit the client to complete several programs in job training and skill development; and take time to get housing vouchers and rental assistance.
Moreover, as explained by DOB's Deputy Borough Commissioner Rodney Gittens, the Building was previously used as an SRO hotel. When the current Code came into effect, permanent residential SROs became classified as "apartment hotels — non transient" (Administrative Code [Housing Maintenance Code] § 27-2004[a][8][a] [defining "apartment hotels" where residents stay 30 days or more as Class A Dwellings]).
In stark contrast, petitioners point to no countervailing evidence regarding the average length of stay in the employment shelter. Petitioners note that the current Code expressly includes "Homeless Shelters" in occupancy group "R-1." We reject petitioners' contention that all shelters are alike and are fundamentally transient. Given the shelter's transitional purpose, supportive housing for employed men, or men seeking employment, DHS rationally concluded, based on its experience with three other similar employment shelters, that residents would remain in the Building for more than 30 days as their "non-transient" or "permanent" residence.
Contrary to the concurrence's contention, DOB did not read the word "transient", mentioned in section 28-310.1.1 (1), into sections (2) and (3) as part of its determination. Rather, it determined that the use of the Building was nontransient and classified the Westhab shelter as a nontransient apartment hotel (Administrative Code [Building Code] § 28-310.1.2).
We note that the current Code also defines "transient" as "[o]ccupancy of a dwelling unit or sleeping unit for not more than 30 days" (Administrative Code [Building Code] § 28-310.2). Additionally, the current Code expressly states that its provisions are to be read in conjunction with the Multiple Dwelling Law and the Housing Maintenance Code, which describe "permanent residence" as including "apartment hotels," "flat houses" and "bachelor apartments," where single adult men historically received food and laundry services within the "Class A" category (Multiple Dwelling Law § 4[8][a]["permanent residence purposes" "shall consist of occupancy of a dwelling unit by the same natural person or family for [30] consecutive days"]; Administrative Code [Housing Maintenance Code] § 27-2004[a][8][a] ["permanent residence purposes" shall consist of occupancy of a dwelling unit by the same natural person or family for [30] consecutive days or more]). In sum, the statutory scheme, when read in its entirety, supports the DOB classification of the Building as nontransient.
The concurrence misconstrues our role in reviewing agency determinations. DOB is empowered by the City Charter to interpret and enforce the Building Code, the Multiple Dwelling Law and Zoning Resolution (see New York City Charter § 643). DOB rationally designated the Building as "R-2" based on its factual assessment of its nontransient use. In contrast to the concurrence, we decline to substitute our own judgment for that of DOB (Matter of Save America's Clocks, 33 NY3d at 210).
Accordingly, we find that DOB rationally concluded that the Building falls in the "R-2" group and is nontransient apartment hotel as its residents will have stays of more than 30 days, on average.
New Hampton's Alteration Plan
Petitioners' argument that in filing the alteration plan for the Building, New Hampton elected to have the Building governed by the current Code is without merit.
The alteration plan states that work will be performed in conformity with the current Code. However, only the work to be done on the first floor is to conform with the current Code, as that work — converting the first floor from a restaurant to offices and recreational space — constituted a change in use requiring adherence to current Code specifications. However, the remainder of the work to be performed in the Building, which simply consisted of painting and the replacement of fixtures, did not require a work permit and was not a change in use.
The election provision to which petitioners refer provides that, "[a]t the option of the owner, . . . an alteration may be made to a multiple dwelling . . . in accordance with" current or prior Code provisions (Administrative Code § 27-120). By its plain language, the election provision applies to work actually performed — alterations "made" — and not to plans for work. Moreover, a related section provides that work done to only a part of a building — "a space in a building" may be done in compliance with the current Code, while "the remaining portion of the building shall be altered to such an extent as may be necessary to protect the safety and welfare of the occupants" (Administrative Code § 27-118[b]). In short, New Hampton was free to elect to conform to the current Code only for that portion of the work as effected a change in use, while performing work on the remainder of the Building under the prior Code.
The Fire Code & Zoning Resolution
We reject petitioners' contention that section 405 of the Fire Code contemplates that homeless shelters will be classified as "R-1" dwellings (see Administrative Code [Fire Code] §§ 29-405.1, 405.4). The Fire Code does not independently designate homeless shelters as "R-1" structures, but instead uses them as an example by referencing the Building Code's classification scheme found in Administrative Code § 28-310.1. As discussed above, DOB rationally classified the Building as an "R-2" dwelling, and the Fire Code's references to the "R-1" group does not alter this analysis. Moreover, the Fire Department, which is entrusted with [*6]interpretation of the Fire Code, approved of the Building's fire protection plan, thereby concurring with DOB's classification of the structure as within the "R-2" group.
Similarly, petitioners' argument that the Building's classification under the Zoning Resolution indicates a change in "Use Group," from "Use Group 2" (residences) to "Use Group 3" (certain types of community facilities) or "5" (hotels primarily used for transient occupancy) is unavailing. First, the Zoning Resolution's use groups dictate only where different types of structures are permitted as-of-right. A structure's classification within a given use group does not control its classification under the Building Code, and vice versa. Hence, even if the Building's change in use from new law tenement SRO to homeless shelter had effected a change in "Use Group" under the Zoning Resolution, this would have no impact on its classification under the Building Code.
Moreover, petitioners' Zoning Resolution "Use Group" contention rests on the same faulty premise as their Building Code arguments: that the Building will be a "transient" residence, and thus definitionally excluded from Zoning Resolution "Use Group 2." In fact, respondents determined that the Building will be a nontransient facility.
In sum, we find that DOB's factual assessment that the Building will continue to fall within the Zoning Resolution "Use Group 2" is rational and is entitled to deference (see New York City Zoning Resolution §§ 12-10, 22-12; Matter of Chelsea Bus. & Prop. Owners' Assn., LLC v City of New York, 107 AD3d 414, 415 [1st Dept 2013]).
General Safety and Public Welfare Considerations
Finally, petitioners argue that even if the Building is properly grandfathered, their expert affidavits rebut the presumption that its use is consistent with general safety and public welfare.
The main danger identified by petitioners' experts is that the nine-story building has only a single, narrow, winding stairway, which leads to the lobby, and not directly to the street. Petitioners maintain that, in the event of a fire, the narrow stairwell will quickly be overwhelmed by the 150 descending residents, who will impede the entry of firefighters and their equipment, with potentially tragic results.
Respondents counter that the Building is constructed of fireproof materials, has fireproof interior doors, is partially sprinklered, has a standpipe riser and hose system on each floor, and contains smoke and heat detectors wired to an alarm system. They also argue that the Fire Department examined the fire safety plan and raised no objections. Moreover, the TCO directs that, until the Building is fully sprinklered, New Hampton must maintain at least two certified fire guards on the premises at all times, supporting that there is a detailed fire safety plan approved by the Fire Department in place for the Building.
Further, respondents argue that the issuance of the TCO itself signifies DOB's determination that occupancy will "not in any way jeopardize life or property" (New York City Charter § 645[f]) or "endanger public health, safety, or welfare" (Administrative Code § 28-118.15).
On balance, we find that the competing evidence raises a question of fact which requires a hearing before Supreme Court pursuant to CPLR 7804(h).
We do not agree that the issuance of the TCO reflects DOB's assessment that the temporary occupancy of the Building will not endanger public safety, health or welfare. The TCO "merely creates a rebuttable presumption that a building complies with New York City law" which has been rebutted by petitioners' expert affidavits (Board of Mgrs. of Loft Space Condominium v SDS Leonard, LLC, 142 AD3d 881, 882 [1st Dept 2016]). Therefore, the matter is remanded to Supreme Court for further proceedings.
Accordingly, the judgment of the Supreme Court, New York County (Alexander M. Tisch, J.), entered April 29, 2019, denying the petition to annul a determination of respondents to [*7]open a shelter at 158 West 58th Street in Manhattan, and dismissing the proceeding brought pursuant to CPLR article 78, should be modified on the law and the facts, to direct a hearing on whether the Building's use is consistent with general safety and welfare standards, and otherwise affirmed, without costs.
All concur except Oing, J. who concurs in a separate Opinion.




OING, J. (concurring)


The relevant facts are more fully set forth in Justice Singh's writing. While I agree with the decision to remand this proceeding for further consideration of the fire safety issues, and that ultimately the R-2 designation for this building is the correct designation, I write separately because I do not interpret section 310.1.1 as limiting the R-1 designation to occupancies being "transiently" occupied for "a period of less than one month" as set forth in section 310.1.1(1) (see Administrative Code of City of NY §§ 28-310.1.1[2] and [3]).
As the record demonstrates, DOB, in reliance on Administrative Code § 28-310.1.1(1), based its R-2 designation for the building on DHS's claim that "the Building is being renovated for use as a homeless shelter for up to 140 single adult men who are employed or actively seeking employment" and who will be "stay[ing] at the shelter for 30 days or more." The R-2 classification applies to occupancies "for permanent resident purposes", i.e., "occupancy . . . for thirty consecutive days or more" (Multiple Dwelling Law § 4[8][a]; Administrative Code § 27-2004[a][8][a]). The majority finds this determination to be rational given that the residents of the shelter will, on average, stay for more than 30 days.
The principle is well settled that "[s]tatutes should be interpreted in a manner designed to effectuate the legislature's intent, construing clear and unambiguous statutory language so as to give effect to the plain meaning of the words used" (Matter of Luongo v Records Access Officer, Civilian Complaint Review Bd., 150 AD3d 13, 19 [1st Dept 2017], lv denied 30 NY3d 908 [2017] [internal quotation marks omitted]). "Where . . . the question is one of pure statutory interpretation, we need not accord any deference to the agency's determination and can undertake its function of statutory construction" (Matter of DeVera v Elia, 32 NY3d 423, 434 [2018] [internal quotation marks omitted]). For the reasons that follow, I find that DOB's interpretation of section 310.1's subdivisions cannot be sustained.
Group R-1 occupancy includes the following:
"1. Residential buildings or spaces occupied, as a rule, transiently, for a period less than one month, as the more or less temporary abode of individuals or families who are lodged with or without meals, including, but not limited to, the following:
"Class B multiple dwellings as defined in Section 27-2004 of the New York City Housing Maintenance Code and Section 4 of the New York State Multiple Dwelling Law, where not classified in Group I-1.
"Club houses.
"Hotels (transient)
"Motels (transient)
"Rooming houses (boarding housestransient)
"Settlement houses
"Vacation timeshares
"2. College or school student dormitories, except for student apartments classified as an R-2 occupancy
"3. Congregate living units owned and operated by a government agency or not-for-profit organization, where the number of occupants in the dwelling unit exceeds the limitations of a family as defined, including, but not limited to, the following:
"Adult homes or enriched housing with 16 or fewer occupants requiring supervised care within the same building on a 24-hour basis
"Fraternity and sorority houses
"Homeless shelters"
(Administrative Code § 28-310.1.1[1]-[3]).
Clearly, Group R-1 comprises three separate categories of residential occupancies. Categories 2 and 3 do not contain the term "transiently" or the phrase "less than one month" (Administrative Code § 28-310.1.1[2] and [3]). Therefore, the "transient" occupancy as it is defined in section 310.1.1(1) is limited to category 1, and should not be read into categories 2 and 3. Indeed, if the municipality intended to apply this temporal limitation to category 2 (college or school student dormitories) and category 3 (congregate living units), the R-1 classification would not have needed three separate categories of residential occupancies. Nor would reading the phrase "transiently, for a period less than one month" into either category statutorily proper. Pursuant to the antecedent rule of statutory construction, "[r]elative or qualifying words or clauses in a statute ordinarily are to be applied to the words or phrases immediately preceding, and are not to be construed as extending to others more remote" (McKinney's Cons Laws of NY, Book 1, Statutes § 254; see Matter of T-Mobile Northeast, LLC v DeBellis, 32 NY3d 594, 608 [2018]).
The shelter at issue clearly does not fall within R-1's category 1 because DOB and DHS have determined based on their review of the facts that the shelter will not be occupied transiently. This determination is entitled to deference. That said, petitioners advance a plausible argument that the shelter is, in fact, a homeless shelter, and, as such, should be classified as R-1 because category 3 clearly lists "homeless shelters." The argument is unavailing.
A "homeless shelter" can only be classified as an R-1 congregate living unit if it fell within that category's definition, i.e., "[c]ongregate living units owned and operated by a government agency or not-for-profit organization, where the number of occupants in the dwelling unit exceeds the limitations of a family as defined" (Administrative Code § 28-310.1.1[3] [emphasis added]). Thus, whether a "homeless shelter" should be given a R-1 classification depends on the number of occupants in the dwelling unit. As is relevant to the issue herein, "family" is defined as "[n]ot more than three unrelated persons occupying a dwelling unit in a congregate housing or shared living arrangement . . . ." (Administrative Code § 28-310.2 [Definitions]).
Here, respondents have represented that the number of occupants in the dwelling units will not exceed the limitations of a family as defined. Specifically, Westhab's proposal to DHS provides that "[t]he building consists of 87 individual rooms and bathrooms" and "[t]he 87 rooms will have a total of 150 beds (singles rooms/doubles/triples)." In addition, Jackie Bray, First Deputy Commissioner for DHS, represents "[t]he Shelter will house 140 residents in 87 rooms" and "[t]here will be two clients housed in each room." Based on these representations, the shelter, even if deemed a homeless shelter, does not fall within the purview of R-1's category 3 for congregate living units.
To conclude, I, respectfully, do not agree that the contemplated term of occupancy of the clients at this particular shelter is the determinative factor that excludes the building from an R-1 classification. I do find, however, that this particular shelter cannot be considered a R-1 [*8]congregate living unit for the above-noted reasons. Accordingly, under the factual circumstances of this particular "employment" shelter, DOB's R-2 designation for this building is proper.
Judgment, Supreme Court, New York County (Alexander M. Tisch, J.), entered April 29, 2019, modified, on the law and the facts, to direct a hearing on whether the Building's use is consistent with general safety and welfare standards, and otherwise affirmed, without costs.
Opinion by Singh, J. All concur except Oing, J. Who concurs in a separate Opinion.
Friedman, J.P., Renwick, Oing, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: AUGUST 13, 2020
CLERK



Footnotes

Footnote 1: Specifically, petitioners noted that "the prevailing wisdom is [ ] that no neighborhood will take a shelter." They also stated that "it's inevitable that the men will be loitering on the block and blocking entrances to residential buildings and small businesses," and "[w]e deserve better than to be getting picked in a grand social experiment to make a cheap political point." They added that "it's going to degrade the neighborhood . . . and the City is going to lose money because it's undesirable to be in such a neighborhood where there's 150 homeless men." One petitioner also cried stating "I am deeply concerned for the safety of [my] three year old daughter as there are no background checks to weed out the criminals from the 150 men that would likely loiter all throughout the street . . . can I hold you responsible if one of those men harass[es] my daughter? Who will be held accountable when our store gets shoplifted . . . and when my mother-in-law gets thrown to the ground." Another noted that often the homeless population are "people with mental health issues, drug and alcohol issues who are urinating and defecating" on the street, and recounted a situation in which a homeless man in the neighborhood urinated on her and her dog. Petitioners also stated that the City is putting them "in danger because you're going to put 150 people in a small area, which will increase crime and the threat of crime and danger . . . We already have our fair share of mentally ill homeless people just creating havoc, and who are violent in their speech, and it's just scary."

Footnote 2: In brief, the experts discussed as follows: (1) Geoffrey K. Clark, an environmental geologist, asserted that the City's environmental review was deficient; (2) Robert Mascali, a former DHS Deputy Commissioner, asserted that the City's Fair Share analysis was deficient; (3) Paul G. Babaktitis, a private investigator and former New York City Police sergeant, mainly discussed anticipated security needs of the shelter; (4) Robert G. Kruper, a fire safety consultant and former captain in the FDNY, averred that the subject building was in violation of the Building and Fire Codes by only having one means of egress, was a potential fire trap, and that the subject building should have been classified as an "R-1" structure due to its transient nature; (5) Robert Skallerup, former Manhattan Borough Commissioner for DOB and a former DHS Deputy Commissioner, concurred with Kruper's findings.

Footnote 3: In brief, the experts discussed as follows: (1) Donald E. Ehrenbeck, an urban planner, described the environmental review performed by the City; (2) Jackie Bray, DHS First Deputy Commissioner, among other things, discussed the City's Fair Share analysis; (3) Rodney F. Gittens, an architect and DOB's Manhattan Deputy Borough Commissioner, asserted that, because it was not being used transiently, the Building was properly classified as "R-2," and, moreover, it was grandfathered in under the 1968 Code and thus did not need to comply with current Code requirements for more than one means of egress.

Footnote 4:Petitioners limit their appeal to the contention that the Building violates applicable codes and is otherwise unsafe.